PITTMAN, Justice,
for the Court:

STATEMENT OF THE CASE

This appeal arises from a judgment of divorce nunc pro tunc entered in the Wayne County Chancery Court.
As this case has an extraordinarily lengthy and complex procedural history, the following summarizes the pertinent dates chronologically:
1) Johnnie P. White and Luther White[1] ■ married on September 14, 1950.
2) Johnnie and Luther were granted a divorce on April 28, 1958 in the Wayne County Chancery Court.
3) Johnnie and Luther remarried on August 29, 1954.
4) Johnnie and Luther were granted a second divorce on May 3, 1965 in the Wayne County Chancery Court.
5) Johnnie and Luther remarried a third time on September 24, 1965.
6) Johnnie and Luther were granted a third divorce on July 2, 1979 in the Wayne County Chancery Court.
7) Johnnie and Luther remarried for the fourth time in Chatom, Alabama, and thereafter separated on July 7, 1992.
8) On July 21, 1992, Johnnie filed a complaint for divorce based on habitual cruel and inhuman treatment and irreconcilable differences.
9) On July 29,1992, Luther filed his answer denying Johnnie’s allegations of cruel and inhuman treatment. In addition, Luther filed a counterclaim, asserting that Johnnie was guilty of habitual cruel and inhuman treatment and constructive desertion, and alternatively pled that irreconcilable differences existed between the parties.[2]
10) On November 2, 1992 and prior to the trial getting underway, the parties offered a handwritten “Consent to Divorce”, which was duly received into evidence. At the close of the testimony and evidence, the chancellor issued a bench opinion, adjudicating all the contested issues as contained in the consent to divorce and granting a *877 divorce on the grounds of irreconcilable differences.
11) Luther White died on November 10, 1992.
12) On November 13, 1992, the consent to divorce was formally filed in the Wayne County Chancery Court.
13) On December 4, 1992, Drew White [Luther’s brother], filed a suggestion of death motion, pursuant to Rule 25, M.R.C.P., asking the court to execute its November 2, 1992, ruling as the final judgment and seeking substitution as a party.
14) On December 15, 1992, Johnnie filed her answer to the suggestion of death, motion of cross-suggestion of death, and in addition, a motion to dismiss, both the complaint for divorce and counterclaim for divorce.
15) A hearing was conducted on December 15, 1992, on the aforementioned motions.
16) On December 29, 1992, the chancellor entered a judgment of divorce between Johnnie and Luther mmc pro tunc November 2, 1992. The chancellor ruled that the parties were irrevocably bound by their consent to divorce, that his adjudication was limited to the parties’ consent to property matters and that all parties were estopped to deny that Johnnie and Luther were divorced as of November 2, 1992.
Aggrieved by the judgment of the lower court, Johnnie on January 20, 1993, filed her notice of appeal to this Court. While Johnnie raises numerous errors, we choose only to address the following pertinent issues:

I. DID THE CHANCELLOR ERR IN OVERRULING JOHNNIE’S CROSS-SUGGESTION OF DEATH AND MOTION TO DISMISS COMPLAINT FOR DIVORCE AND COUNTERCLAIM FOR DIVORCE?

II. DID THE CHANCELLOR ERR IN ENTERING THE JUDGMENT OF DIVORCE NUNC PRO TUNC ON DECEMBER 29, 1992, BETWEEN JOHNNIE AND LUTHER WHITE?

III. DID THE CHANCELLOR ERR IN RELYING ON THE CONSENT TO DIVORCE FOR GRANTING THE PARTIES A DIVORCE ON THE GROUNDS OF IRRECONCILABLE DIFFERENCES AS IT WAS NOT FILED WITH THE WAYNE COUNTY CHANCERY CLERK UNTIL NOVEMBER 13, 1992 AND ENTERED ON THE DOCKET ON DECEMBER 29, 1992?

After due consideration and review of all issues raised, we find the judgment of the chancellor to be in accord with existing law, and therefore affirm.

STATEMENT OF THE FACTS

The following facts were developed at the trial held on November 2, 1992.
Johnnie requested that the court grant her a divorce and award her: 1) the business (Trigg Cleaners); 2) the marital home and contents therein; 3) a lien established for one-half of the amount of the parties’ rental property for her contributions; 4) a lien established for one-half of the value of a certificate of deposit held by Luther; and finally 5) attorney’s fees.
Luther requested that the court grant him the divorce and award him: 1) an equitable lien on the marital home the amount of the improvements made; 2) a share of the contents within the marital home; 3) monies that he retained in his name; 4) a return by Johnnie of his share of the monies which Johnnie withdrew from the parties’ joint accounts at the time he became ill; 5) exclusive use, ownership and possession of the 1976 Oldsmobile; 6) the C.D.; and 7) attorney’s fees. Luther also requested that the court allow the parties to retain ownership in the rental property so they could both derive income from it.
The joint ownership of the rental property was not contested. The marital home was titled in Johnnie’s name alone and the C.D. and automobile were titled solely in Luther’s name.
Thereafter, the parties submitted a consent to divorce and presented the aforementioned property matters for resolution by the chancellor.
Johnnie testified that the C.D. was in both Luther’s name and Jessie Lee Kittrell’s *878 name and its value was approximately $29,-000.00. Johnnie testified that Luther was able to place money from his retirement benefits into this account because she paid all the household bills out of her account. Johnnie further maintained that the couple kept separate accounts; Luther’s sole source of income was his social security; and she paid, out of her account, all the bills, insurance and taxes in maintaining the marital home.[3] In addition, Johnnie stated that she paid for a new roof for the home out of her account.
As to the parties’ rental property, Johnnie testified that they purchased the home in 1969 and that she had paid the taxes on that property each and every year since purchasing the property. Johnnie stated that Luther paid for a new roof for the home and she paid for the costs of painting both the inside and outside of the home. The parties received $150.00 per month in rental income from the property.
The chancellor first ruled that all property resolutions set forth in the prior three divorce decrees were binding so that the only matters properly before the court were those arising since the parties’ last marriage. Johnnie alleged that the only item purchased for the home by Luther since 1979 was a new television set.
Johnnie testified that in 1985, Luther underwent prostate surgery and subsequently permitted her name to be placed on his checking account. Johnnie stated that she often wrote out checks for Luther to sign for his needs but that she never wrote a check from his account for her needs. Johnnie was not sure whether Luther’s social security check was deposited into this joint account after 1985, but she deposited her social security check into her individual account. Luther testified that while his social security check was deposited into the joint account, Johnnie’s went into her own account.
Luther also testified that after he suffered a stroke on March 30, 1992, Johnnie closed' her shop. Sometime thereafter, around April 3, 1992, Johnnie wrote a check foils,300.00 from the joint account and deposited it into her account to assist with paying the bills. Johnnie stated that she did this after Luther became ill, because she believed that “Drew White and that bunch was after his money.” Johnnie, on August 3, 1992, transferred $3,000.00 from the checking account into a C.D. Johnnie agreed that her bank balance as of July 7, 1992, the day Luther moved out of the marital home, was $7,939.00. Johnnie also drew two $600.00 checks ($1,200.00) from Luther’s account and deposited them into her individual account, because she feared Drew White was trying to get the money.
Since closing the shop, Johnnie’s monthly income has consisted of her social security ($409.00) and rental monies, including $150.00 from the parties’ jointly held rental property, plus three other apartments ($175.00, $175.00, and $150.00) owned by Johnnie individually and located in the building with the business. However, she added that a freeze in 1989 destroyed much of two of the three rental units, and cost her approximately $10,000.00 to repair.
At the time of trial, Johnnie received an $87.00 dividend per month from the sale of property in the amount of $15,000.00. She also received $2,500.00 for the sale of another lot, part of her property. In addition, she received $400.00/month for caring for her brother, Wyatt Purvis, who began living in the parties’ home sometime before Luther suffered his stroke.
Luther testified that he moved out of the marital home on July 7, 1992, to live with his brother, Drew White, and his sister-in-law, Christine. Luther contended that, while he was in the hospital, he never gave Johnnie permission to withdraw the $8,300.00, from the joint account.
Luther stated that the money used to purchase his C.D. was from oil leases to various people over the years and from the sale of his mobile home that he purchased after the third divorce and prior to the couple’s fourth marrying. He also stated that he applied the accrued interest toward the principal of the *879 C.D. The C.D. was in his name and in his brother’s name, as his brother was serving as his g-uardian. After his stroke, Luther used some of the money from the C.D. to purchase a lift chair, so that the C.D.’s value was approximately $20,000.00.
Luther requested that the court award him the cedar chest and his clothes in it, the television he purchased, a biscuit tray of his mother’s, his Bible, and the riding lawn mower. He also requested that the court order Johnnie to replace the $8,300.00 taken from his social security and out of the account.
Following the testimony, the chancellor ruled from the bench as follows:
The ownership of the defendant’s C.D., it is the Court’s opinion that that belongs to the defendant Luther.... I do not think that he is entitled to a lien against her home for any repairs or improvements. They both lived in it. Whether the plaintiff, Mrs. White, should have a lien against the defendant’s one-half interest in the real property for taxes and insurance she paid through the years. The same ruling applies to that.... The property is owned jointly.... It’s apparent that these two can not operate their property together. I am going to order that property sold and the proceeds divided.
The evidence reflects that after he had a stroke on April 3, she withdrew $8,300.00 from a joint account that was established in 1985.... It is the court’s opinion that they jointly owned that account at the time of his stroke, and he should be reimbursed for one-half the amount she withdrew.
The next issue is whether the defendant should have exclusive use, ownership and possession of some of the household goods and appliances. It is the Court’s opinion he should, and the ones that have been specifically mentioned, which the Court awards him, are the cedar chest and all of his clothes, the color T.V., his large print Bible, the riding lawn mower, weed eater and leaf blower. Those are the ones he requested.... The Court is of the opinion that they both have sufficient funds to pay their attorneys, and they both should pay their own attorneys.
... Those are all the issues that have been submitted to the Court, and I’ll grant the divorce on those conditions.
Luther White died on November 10, 1992. The court on December 29, 1992 issued a judgment of divorce nunc pro tunc, November 2, 1992, which ordered in pertinent part:
At the outset of trial, the parties announced to the court that they had entered into a Consent to Divorce on the Sole Ground -of Irreconcilable Differences, and designated certain items for the Court’s adjudication. The Court found that the Consent entered into by the parties was in the proper statutory form, and that they should be granted a divorce on the sole ground of irreconcilable differences. The Court heard testimony of the parties pertaining solely to division of property rights between them. At the conclusion of trial, the Court rendered its Bench Opinion granting Plaintiff and’Defendant certain relief.
After the conclusion of trial, the parties exchanged a draft judgment, which was neither approved by both parties nor executed by the Court.
⅜ ⅜ ⅜ * ⅜ ⅜
... [Tjhe Court finds that the parties entered into an irrevocable Consent to Divorce, pursuant to Section 93-5-2(3), Mississippi Code 1972, as amended and that there was no decision to be made by the Court regarding divorce between the parties. The Court finds that the parties were bound by their irrevocable agreement, which, according to the terms of the statute, could not be withdrawn once the Court commenced proceedings in this action. The Court adjudicated in its Bench Opinion, ... that the parties were divorced, and the Court now finds that both parties are now estopped by their agreement and by the Court’s adjudication, from denying that they were divorced on November 2, 1992. Accordingly, the Court finds that a judgment for Divorce between the parties should be entered mmc pro tunc.
The Court finds also that it made a full and complete adjudication between the parties as to the remaining issues admitted *880 to it by agreement, and the adjudication is set forth in the Court’ Bench Opinion. All issues between the parties, both contested and the Consent to Divorce, were finally adjudicated in all respects by the Court, after having heard detailed testimony and having received documentary evidence. This was a completed ease finally adjudicated in all respects.

LAW

I. DID THE CHANCELLOR COMMIT MANIFEST ERROR IN OVERRULING JOHNNIE’S CROSS-SUGGESTION OF DEATH AND MOTION TO DISMISS COMPLAINT FOR DIVORCE AND COUNTERCLAIM FOR DIVORCE?

II. DID THE CHANCELLOR COMMIT MANIFEST ERROR IN ENTERING THE JUDGMENT OF DIVORCE NUNC PRO TUNC ON DECEMBER 29, 1992, BETWEEN JOHNNIE AND LUTHER WHITE?

“Courts may by nunc pro tunc orders supply omissions in the record of what had previously been done, and by mistake or neglect not entered.” Green v. Myrick, 177 Miss. 778, 171 So. 774 (1937).
Nunc pro tunc means “now for then” and when applied to the entry of a legal order or judgment, it normally does not refer to a new or fresh (de novo) decision, as when a decision is made after the death of a party, but relates to a ruling or action actually previously made or done but concerning which for some reason the record thereof is defective or omitted. The later record making does not itself have a retroactive effect but it constitutes the later evidence of a prior effectual act.
Thrash v. Thrash, 385 So.2d 961, 963 (Miss. 1980), quoting Becker v. King, 307 So.2d 855, 858-59 (Fl.App.1975).
Johnnie relies on Pittman v. Pittman, 375 So.2d 415 (Miss.1979), in support of the arguments raised in issues I, III and IV. The facts in Pittman reflect that Ella Polk Pittman filed a petition for a divorce and requested that she be granted a divorce on the grounds of habitual cruel and inhuman treatment. The hearing was held on September 26, 1978, and the final decree was not entered until October 27, 1978. Some three weeks after receiving the letter, a decree was prepared and mailed to the chancellor. This decree was signed by the chancellor and filed on October 27, 1978. Petitioner died in the interim on October 17, 1978.
This Court held, on the facts of the case, that the death of the party prior to the entering of the decree had rendered moot the question on divorce, stating that “all issues in the case were incidental to the request for a divorce and the contest thereon, and the entire cause died with the complainant.” Pittman, 375 So.2d at 417.
Unlike the facts in Pittman, in the present case, there was a formal adjudication of the issues in writing and signed by the chancellor, prior to the death of one of the parties.
Johnnie also cites Griffith, Mississippi Chancery Practice § 620, at 667 (1950), which states in part:
A valid decree cannot be rendered in favor of two persons, one of whom at the time is dead. Such a decree is void. And likewise a decree rendered against a defendant after his death is void, if he was the sole defendant or was an indispensable party to the suit — although the interlocutory decree was rendered while he was alive.
The general rule is that the death of a party in a divorce action prior to the final decree ends the marriage of the parties and cancels the bill of complaint for divorce. Pittman v. Pittman, 375 So.2d 415 (Miss. 1979).
The case of Thrash v. Thrash, 385 So.2d 961 (Miss.1980), is directly analogous to the case sub judice. In Thrash, the wife petitioned the court for a divorce on the ground of habitual cruel and inhuman treatment. The husband answered and filed a cross-bill in which he prayed for a divorce upon similar grounds. The case was fully tried and submitted to the chancellor for final decision. The chancellor took the matter under advisement and on March 31, 1978, determined all issues on the merits and rendered his decision by written opinion. The opinion was *881 signed and filed with the clerk on April 1, 1978. The chancellor awarded the husband a divorce upon the grounds set forth in the cross-bill. A decree was drafted, approved by both solicitors, and forwarded to the chancellor for signature. This decree was duly received by the chancellor on April 8, 1978, signed by him on that same date, but dated April 10, 1978. The husband was killed on April 9, 1978.
On May 16, 1978, Pearl Marie Thrash filed a suggestion of death and motion to dismiss. The motion was based on the fact that the appellee had died prior to the decree’s being filed. The chancellor dismissed the motion and ordered the decree of divorce theretofore signed by the chancellor, to be entered nunc pro tunc, the date it was signed by the first chancellor, April 8, 1978.
The appellant in Thrash claimed that the decree signed by the chancellor on April 8, 1978, and dated April 10, 1978, was without effect and a nullity because appellee died on April 9, 1978, before the decree was filed with the. clerk.
The majority opinion in Thrash relied on Section 11-7-25, Mississippi Code Annotated (1972), which in pertinent part provides:
Where either party shall die between verdict and judgment, such death need not be suggested in abatement, but judgment may be entered as if both parties were living....
Applying § 11-7-25, this Coui-t determined that “in a case such as this, where the case has been fully tried and finally decided on its merits and nothing remains to be done except the entry of a decree, the decree would follow as if both parties were living.” Thrash, 385 So.2d at 962.
We have concluded that, in the absence of some special circumstances such as would cause a miscarriage of justice by so doing, the provisions of that section [§ 11-7-25] apply in a ease such as this, the death of the husband having occurred long after the formal decision of all issues by the trier of -facts. To hold otherwise, we think, would work a manifest miscarriage of justice.
Thrash, 385 So.2d at 964.
In the present case, from a technical standpoint, Luther died while married, since his death was prior to the entry of the decree. However, the record clearly indicates that all submitted issues had been litigated and ruled upon by the chancellor on November 2, 1992. Nothing more was to be accomplished in the interim between the ruling and formal filing of the, judgment.
In addition to the reliance on § 11-7-25, the Thrash opinion quoted extensively from 104 A.L.R. 654, 664 (1936):
The general rule, so far as a general rule may be deduced from the few cases falling within this subdivision, is that, if the facts justifying the entry of a decree were adjudicated during the lifetime of the parties to a divorce action, so that a decree was rendered or could or should have been rendered thereon immediately, but for some reason was not entered as such on the judgment record, the death of one of the- parties to the action subsequently to the rendition thereof, but before it is in fact entered upon the record, does not prevent the entry of a decree nunc pro tunc to take effect as of a time prior to the death of the party, [citations omitted] But if no such final adjudication was made during the lifetime of the parties, a decree nunc pro tunc may not be entered after the death of one of the parties, to take effect as of a prior date, [citations omitted]
Id. at 962-63.
Because the chancellor both fully considered all issues raised by the parties and rendered his opinion prior to Luther White’s death, the order entering judgment of divorce nunc pro tunc was not manifestly in error, and as such, does not create reversible error.
III. DID THE CHANCELLOR ERR IN RELYING ON THE CONSENT TO DIVORCE FOR GRANTING THE PARTIES A DIVORCE ON THE GROUNDS OF IRRECONCILABLE DIFFERENCES AS IT WAS NOT FILED WITH THE WAYNE *882 COUNTY CHANCERY CLERK UNTIL NOVEMBER 13, 1992 AND ENTERED ON THE DOCKET ON DECEMBER 29, 1992?
Johnnie asserts that because the handwritten consent to divorce entered into by the parties was not filed until November 13,1992, the chancellor was manifestly wrong-in entering the judgment of divorce. However, the parties elected to submit only the property disputes to the chancellor on November 2, 1992, and at that point could have raised the fact that the consent to divorce had not yet been filed.
Once more, this Court’s opinion in Thrash is relevant. The opinion, in part, relied on Berkenfield v. Jacobs, 83 So.2d 265 (Fla.1955), a case in which the factual question was analogous to Thrash as well as to the case presently before the Court.
The Florida Supreme Court, in reversing, held that recordation of a final decree is a procedural and ministerial act, that a decree when recorded is but evidence of judicial action already taken and that a failure to perform the act of recording may be remedied by an order nunc pro tunc. The Florida Court held that the judicial labor had ended with the signing of the decree, and concluded that when the clerk recorded it had no effect upon the decision of the chancellor dissolving the union. Thrash, 385 So.2d at 963; see also Becker v. King, 307 So.2d 855 (Fla.App.1975) (“once court of record has jurisdiction of cause and parties and all evidence has been presented, cause is then ripe for judgment and court is not thereafter deprived, by death of a party, of its inherent power to render a decision or judgment and may do so in the interest of justice by a judgment nunc pro tunc as of the time of submission”).
Based on this Court’s prior analysis and interpretation of these two Florida decisions, we hold that the chancellor in the present case was correct in his ruling.

CONCLUSION

A reading of the chancellor’s opinion and final judgment makes clear that he intended his ruling on November 2, 1992, to be a final and complete adjudication of the matters presented for his consideration. Therefore, the judgment of divorce nunc pro tunc was the correct legal measure for resolving all issues currently before this Court.
As the chancellor did not err in his rulings, we affirm the judgment of divorce nunc pro tunc entered by the Wayne County Chancery Court on November 2, 1992.
AFFIRMED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, BANKS, McRAE, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.

. The estate of Luther White, continues to be represented by Mary K. Smith, Administratrix, by Order of this Court dated October 27, 1993.

. On August 2, 1992, Appellant filed her Answer denying all allegations raised in Appellee's Counterclaim.

. On cross-examination, it was pointed out that some of the checks offered as exhibits in support of this contention were actually checks that were paid by Appellant for taxes on her individual properties, i.e. the apartments and pressing shop.