## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-01148-COA

PEGGY P. MCGREW                                                    APPELLANT

v.

CHARLES ELLIOT MCGREW, DECEASED                          APPELLEE

DATE OF JUDGMENT:              11/22/2013
TRIAL JUDGE:                   HON. SANFORD R. STECKLER
COURT FROM WHICH APPEALED:     HARRISON COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:       MICHAEL W. CROSBY
                               WILLIAM WARREN SATTERFIELD
ATTORNEY FOR APPELLEE:         CHARLES ELLIOT MCGREW (DECEASED)
NATURE OF THE CASE:            CIVIL - DOMESTIC RELATIONS
TRIAL COURT DISPOSITION:       GRANTED APPELLANT DIVORCE AND
                               DIVIDED MARITAL PROPERTY
DISPOSITION:                   REVERSED AND RENDERED - 12/15/15
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE GRIFFIS, P.J., BARNES AND JAMES, JJ.

### BARNES, J., FOR THE COURT:

¶1.     Peggy McGrew was granted a divorce from Charles McGrew after his death. Although the chancellor signed the divorce judgment nunc pro tunc to a date prior to Charles's death, the divorce and division of property were not finally adjudicated until after he died. Because a divorce action that is not finalized while both spouses are living abates upon one spouse's death, the chancellor had no authority to grant the divorce after Charles's death. Therefore, we reverse and render the chancellor's decision.

### FACTS AND PROCEDURAL HISTORY

¶2.     Peggy and Charles were married in 1999. No children were born of the marriage,

although both have grown children. In 2007, the couple opened a car-hauling business, where Charles worked. In November 2008, Charles admitted to having an affair with the wife of their largest business client. Peggy and Charles's marriage and business suffered. They attended counseling and attempted to reconcile. In June 2010, Peggy learned that Charles had sexually abused her granddaughter. The couple separated, and, on June 29, 2010, Charles was incarcerated. He later pled guilty to two counts of touching a child for lustful purposes. He was sentenced to serve fifteen years in the custody of the Mississippi Department of Corrections.

¶3. On July 14, 2011, Peggy filed for divorce in the Harrison County Chancery Court. Peggy alleged grounds of adultery and, alternatively, habitual cruel and inhuman treatment and desertion. She also sought temporary relief. A hearing was held on July 30, 2012. Both parties were represented by counsel. On September 4, 2013, the chancellor entered an order directing Peggy to liquidate three assets and keep the proceeds—a 1992 Jeep Wrangler, a 2001 Chevrolet pickup truck, and a 2003 Yamaha jet ski. Also, because Charles was concerned about loss, the chancellor's order permitted Charles to send a representative to the marital property to make a record of its contents.

¶4. At the divorce hearing on November 22, 2013, the chancellor orally granted Peggy a divorce based on Charles's adultery and imprisonment. The chancellor divided the marital property and granted Peggy use of the couple's jointly owned marital home until Charles's death or release from prison, at which time the home would be sold and the proceeds equally divided. On his Uniform Chancery Court Rule 8.05 financial statement, Charles valued the

home at $200,000, with approximately $171,000 in equity. At the time of the oral ruling, Charles had a life expectancy of less than a year due to various health issues. He was seeking parole on this basis. The chancellor directed the attorneys to prepare a judgment consistent with his oral ruling.

¶5. On December 2, 2013, Peggy filed a motion for reconsideration of the oral ruling. At this time, the parties had not yet presented the chancellor with a written judgment; nor had a written judgment been entered. Peggy's chief concern in her motion was the chancellor's ruling regarding the sale of the marital home upon Charles's death or release from prison. She argued the forced sale and equal division of the proceeds of the marital home was inequitable and failed to account for Charles's fault in the demise of the marriage. Peggy argued she was entitled to the exclusive use and ownership of the marital home. A hearing on the motion for reconsideration was held on March 14, 2014. No ruling was made at the hearing. On March 25, 2014, the chancellor directed Peggy's counsel to prepare and submit a final judgment of divorce within ten days based on the bench ruling, and also to submit law in support of the arguments made in the motion for reconsideration.

¶6. Charles died on June 10, 2014. That same day, Peggy moved to withdraw her divorce complaint. She argued this was permissible because no written judgment of divorce had been entered prior to Charles's death, and the chancellor had not ruled on her motion for reconsideration. Charles's attorney filed a response, arguing that the oral ruling was final and binding; and, even if it was not, the divorce and property division should be enforced as a matter of equity. Charles's attorney further argued bad faith on behalf of Peggy and lack

3

of diligence on the behalf of the chancellor for the failure to prepare or enter a final written judgment in the seven months following the oral ruling. Peggy filed a rebuttal to the response. Peggy asserted that Charles was likewise at fault for the delay, as he could have submitted a proposed judgment to the chancellor, but did not do so. Peggy's rebuttal was filed on June 20, 2014.

¶7. The next entry on the chancery court's docket is the July 18, 2014 final written judgment granting the divorce based on Charles's adultery and imprisonment. The judgment was signed on July 18, 2014, nunc pro tunc to November 22, 2013, the day of the oral ruling. Consistent with the oral ruling, the chancellor granted Peggy use of the marital home until Charles's death or release from prison, at which time the house would be sold and the proceeds equally divided. The chancellor awarded certain personal property to each party, and ordered the parties to confer and agree to the division of the remaining personal property. The chancellor ordered the parties to submit a list to each other, if they could not agree on a division of the remaining personal property.[1]

¶8. Peggy timely appealed, raising three issues: (1) since no written judgment was entered prior to Charles's death, the chancellor erred by not permitting her to withdraw her divorce complaint upon his death; (2) alternatively, the chancellor failed to take Charles's fault into consideration when dividing the marital property; and (3) alternatively, the chancellor failed to classify the parties' property as martial or nonmartial before dividing the property. As we find the action abated upon Charles's death, we do not discuss issues two

---

[1] Obviously, the parties could not comply with these latter requirements, as Charles was deceased at the time the order was entered.

and three.

## DISCUSSION

¶9.     Before conducting our analysis, we note that no appellee's brief was filed.  Charles died prior to this appeal.  There was no suggestion of death under Mississippi Rule of Civil Procedure 25 or substitution of parties under Mississippi Rule of Appellate Procedure 43(a), and no one has entered an appearance on Charles's behalf.  Charles's trial attorney was permitted to withdraw as counsel upon entry of the divorce judgment.

¶10.     We are presented with two options when the appellee has not filed a brief.  The first "is to take the appellee['s] failure to file a brief as a confession of error and reverse." *Miller v. Pannell*, 815 So. 2d 1117, 1119 (¶7) (Miss. 2002).  This should be done when the record is complicated or voluminous, and the appellant has presented an apparent case of error. *Id.* The second is to disregard the appellee's failure to file a brief and affirm the conviction. *Id.* This option is reserved for situations where there is a "sound and unmistakable basis . . . upon which the judgment may be safely affirmed." *Id.*

¶11.     Here, the record is not complicated or voluminous.  The error, however, is apparent. Upon review, we find the chancellor lacked authority to enter the divorce judgment after Charles's death.  Alternatively, we find the error was confessed, since no appellee's brief was filed, and the appellant has presented an apparent case of error.

### I.     Jurisdiction

¶12.     Prior to the entry of the final judgment, Peggy filed a motion for reconsideration and a motion to withdraw the divorce complaint.  Peggy states in her brief that no written order

5

was entered ruling on either motion. No representative has entered an appearance on Charles's behalf to challenge appellate jurisdiction. Nonetheless, this issue must be addressed, as "we must acknowledge our own lack of jurisdiction." *In re A.M.A.*, 986 So. 2d 999, 1006 (¶10) (Miss. Ct. App. 2007). A notice of appeal is ineffective if filed before the disposition of any motions listed in Mississippi Rule of Appellate Procedure 4(d). Thus, if Peggy's motions were timely filed, are of the type listed in Rule 4(d), and have not been ruled upon, this Court has no jurisdiction over this appeal.

¶13. "A motion for reconsideration requesting a change in the result of a bench trial has been deemed to be a motion to alter or amend the judgment pursuant to Mississippi Rule of Civil Procedure 59(e)." *Street v. Street*, 936 So. 2d 1002, 1008 (¶15) (Miss. Ct. App. 2006). Rule 59 motions must be filed within ten days of a decision. They may be filed from a bench ruling, without waiting for the entry of a written judgment. *Street*, 936 So. 2d at 1008-09 (¶18). Peggy's motion for reconsideration was filed on December 2, 2013—ten days after the bench ruling. Thus, Peggy's motion is, in effect, a timely filed Rule 59(e) motion to alter or amend the oral ruling. A timely filed Rule 59 motion stays the time for appeal under Rule 4(d).

¶14. While no separate order was entered denying the motion for reconsideration, it was discussed in the chancellor's findings of fact and conclusions of law. The chancellor states: "The only requested reconsideration was the disposition of the marital home[,] which was conclusively dealt with during the bench ruling." The final judgment was signed on July 18, 2014, five months after the March 14, 2014 hearing on the motion for reconsideration, at

6

which the chancellor took the motion under advisement. We find the entry of the final judgment effectively denied the motion for reconsideration. The chancellor's findings were simply put into one order instead of two.

¶15. We likewise find the final judgment effectively denied the motion to withdraw the divorce complaint. Although it was not specifically mentioned in the final judgment, it was impliedly overruled by the entry of the divorce. Regardless, even if it was not, the motion to withdraw the divorce complaint does not affect this Court's jurisdiction. The June 10, 2014 motion to withdraw the divorce complaint was not a Rule 59 motion, as it was not filed within ten days of the bench ruling; nor does it fall under any other category of motions listed in Rule 4(d) that would render the notice of appeal ineffective. Thus, even if the motion to withdraw the divorce complaint was not ruled upon, it does not affect this Court's jurisdiction. We find the notice of appeal filed within thirty days of the July 18, 2014 judgment was effective, and jurisdiction is proper.

## II. Abatement of Divorce Action Upon Charles's Death

¶16. Peggy argues the divorce action abated on Charles's death, and the chancellor had no authority to enter the final judgment nunc pro tunc after Charles's death.

¶17. Generally, a pure divorce action abates upon the death of one spouse prior to the final decree. *Pittman v. Pittman*, 375 So. 2d 415, 416 (Miss. 1979). Once a spouse dies, "there is then no status of marriage upon which the final decree of divorce may operate." *Id.* (quoting *Caprita v. Caprita*, 60 N.E.2d 483, 485 (Ohio 1945)). Our supreme court, quoting the *American Law Reports*, has stated:

7

It is well settled by practically all of the authorities that, upon the death of one of the parties to a purely divorce action, before the entry of a final decree therein, whether before or after the entry of an interlocutory decree or a decree nisi, the action abates with the consequence that the action may not be continued and no final decree of divorce may be entered thereafter, since the object sought to be accomplished by the final decree, that is, the dissolution of the marriage relation, is already accomplished by the prior death of one of the parties, and there is then no status of marriage upon which the final decree of divorce may operate. The result is that, notwithstanding the pending divorce action and the fact that a divorce might have been granted had no death occurred, the wife is regarded as the widow of the deceased husband, or the husband is regarded as the widower of the deceased wife, as the case may be.

*Id.* (quoting 104 A.L.R. 654).

¶18. Like the request for a divorce, when one spouse dies, "all issues . . . incidental to the request for a divorce and the contest thereon . . . die[]." *Id.* at 417. This is consistent with the general rule that "[l]itigation is not to be carried on by or against any deceased person." Billy G. Bridges & James W. Shelson, *Griffith Mississippi Chancery Practice* § 591 (2000). As explained in *Griffith Mississippi Chancery Practice* § 620:

A valid judgment cannot be rendered in favor of two persons, one of whom at the time is dead. Such a judgment is void. And likewise a judgment rendered against a defendant after his death is void if he was the sole defendant or was an indispensable party to the action, although the interlocutory or temporary judgment was rendered while he was alive.

¶19. If, however, all issues have been formally adjudicated prior to one spouse's death, the entry of the divorce judgment postmortem may be permissible under limited circumstances. The rule in such a situation is as follows:

[I]f the facts justifying the entry of a decree were adjudicated during the lifetime of the parties to a divorce action, so that a decree was rendered or could or should have been rendered thereon immediately, but for some reason was not entered as such on the judgment record, the death of one of the parties to the action subsequently to the rendition thereof, but before it is in fact

8

entered upon the record, does not prevent the entry of a decree nunc pro tunc to take effect as of a time prior to the death of the party. But if no such final adjudication was made during the lifetime of the parties, a decree nunc pro tunc may not be entered after the death of one of the parties, to take effect as of a prior date.

*Thrash v. Thrash*, 385 So. 2d 961, 962-63 (Miss. 1980) (internal citations omitted) (quoting 104 A.L.R. 654, 664 (1936)).

¶20. Here, the chancellor found that because he intended the bench ruling to be final, the entry of the nunc pro tunc order was permissible. Nunc pro tunc means "now for then." *White v. Smith*, 645 So. 2d 875, 880 (Miss. 1994). A nunc pro tunc order is used to "supply omissions in the record of what had previously been done, and by mistake or neglect not entered." *Id.* (quoting *Green v. Myrick*, 177 Miss. 778, 171 So. 774 (1937)). A judgment entered nunc pro tunc "normally does not refer to a new or fresh (de novo) decision, as when a decision is made after the death of a party, but relates to a ruling or action actually previously made or done but concerning which for some reason the record thereof is defective or omitted." *Id.* (quoting *Thrash*, 385 So. 2d at 963). The entry of a nunc pro tunc order "does not itself have a retroactive effect[,] but it constitutes the later evidence of a prior effectual act." *Id.* (quoting *Thrash*, 385 So. 2d at 963).

¶21. The chancellor relied on *White* in support of his decision that the entry of the nunc pro tunc order was permissible. In *White*, the wife, Johnnie White, filed a complaint for divorce from her husband, Luther White. *Id.* at 876. The parties later consented to an irreconcilable-difference divorce. *Id.* at 879. A hearing was held, and the chancellor orally granted the divorce. *Id.* However, before the oral ruling was reduced to writing, Luther died. *Id.* at 877.

9

Upon Luther's death, Johnnie moved to dismiss the divorce action. The motion was denied. The chancellor then entered the divorce judgment nunc pro tunc to the date of the bench ruling. The supreme court found the nunc pro tunc judgment permissible, as all matters had been finally adjudicated prior to Luther's death. *Id.* at 881. The supreme court reasoned:

> [F]rom a technical standpoint, Luther died while married, since his death was prior to the entry of the decree. However, the record clearly indicates that all submitted issues had been litigated and ruled upon by the chancellor on [the date of the bench ruling]. Nothing more was to be accomplished in the interim between the ruling and formal filing of the judgment.

*Id.*; *see also Thrash*, 385 So. 2d at 964 (finding divorce judgment proper where all matters were resolved and the judgment was signed by the chancellor one day prior to the husband's death, but the judgment was not filed by the clerk until one day after the husband's death).

¶22. Although not discussed by the chancellor, we find it important to note a key distinction between this case and *White*. *White* involved a consent divorce, whereas Peggy sought a fault-based divorce. The parties in *White* had entered into an "irrevocable consent to divorce" prior to Luther's death. *White*, 645 So. 2d at 879. Because the parties had signed the irrevocable consent to divorce, the parties were statutorily bound by this contractual agreement, and they were estopped from arguing otherwise. *Id.* Thus, there was no decision for the chancellor to make regarding the grant or denial of the divorce. Oral factual findings were made regarding the division of property not previously agreed upon. These findings were incorporated into the final judgment. However, it was undisputed these matters were adjudicated as of the date of the bench ruling. *Id.* at 881.

¶23. Because of this distinction, we find the chancellor's reliance on *White* was misplaced.

10

We agree with Peggy's assertion that the facts here are analogous to those in *Pittman*, 375 So. 2d at 415, where no final adjudication was found. In *Pittman*, the wife, Ella Mae Pittman, died between the chancellor's bench ruling and final divorce judgment. *Id.* at 415-16. Two weeks prior to her death, the chancellor sent a letter to both sides, setting out his findings and stating that a divorce would be granted in favor of Ella Mae. *Id.* He instructed the attorneys to prepare a judgment consistent with the letter. After negotiations, the attorneys agreed to the form of a final judgment and sent it to the chancellor. *Id.* at 416. The chancellor executed the judgment ten days after Ella Mae's death. *Id.* The supreme court reversed, finding that the chancellor had no authority to enter the final judgment after Ella Mae's death, because "all issues in the cause were incidental to the request for a divorce and the contest thereon, and the entire cause died with the complainant." *Id.* at 417. In finding the action abated upon Ella Mae's death, the supreme court stated:

> The authorities are clear that the death of [a party] in the divorce action prior to the execution and entry of the final decree by the lower court ended the marriage of the parties and cancelled fully the bill of complaint for divorce and incidental property relief. This is so even though testimony had been heard in the cause and the court had issued what might be termed an "interlocutory order" in the form of a letter.

*Id.* at 416. The supreme court emphasized "that every decree is in the breast of the court until entered, and a decree has no validity until written out and signed by the chancellor." *Id.* (quoting *Orr v. Myers*, 223 Miss. 856, 862, 79 So. 2d 277, 278 (1955)).

¶24. Although the chancellor in *Pittman* did not enter the judgment nunc pro tunc to a date prior to Ella Mae's death, we find this of no consequence. The fact remains that the divorce was not finally adjudicated prior to Ella Mae's death. A nunc pro tunc judgment is meant

11

to supply omissions in the record, not to set forth a new or fresh decision. *White*, 645 So. 2d at 880. Thus, a nunc pro tunc judgment would not have been permissible.

¶25. Like *Pittman*, we find the record here does not support a finding of finality prior to Charles's death. First, in his bench ruling, the chancellor left the record open for the parties to resolve certain property disputes, stating:

> I want to give those things to each of the parties in accordance with its emotional value to either of the parties. . . . So y'all try [to] work those out in that manner so that I don't have to try to do it myself after this trial is over. And if I have to reconvene the trial to deal with those, I will. But I don't want the parties to have to get buried in that stuff. And we'll get back to that.
>
> . . . .
>
> Now, I'm going to leave the record open for you all to divide those personal items.

¶26. Next, Peggy's motion for reconsideration was not ruled upon during Charles's lifetime. While the hearing on this motion occurred during Charles's lifetime, on March 14, 2014, no oral ruling was made. Instead, at the conclusion of the arguments, the chancellor stated:

> All right. . . . What I'm going to do is take that under advisement and I'll give you a decision within 30 days. . . . If you want to submit any law, either side may do so within 10 days.

There is no indication that law was submitted, or that the chancellor reached a decision in thirty days. The next mention of the motion for reconsideration appears in the chancellor's findings of fact and conclusion of law, which were not drafted or entered until after Charles's death.

¶27. Also at the hearing on the motion for reconsideration, the following exchange took

12

place regarding the lack of a final judgment:

| | |
|---|---|
| [CHARLES'S COUNSEL]: | . . . Because of Mr. Crosby's filing this motion [for reconsideration], we have not yet supplied the Court with an order and I hope we're not negligent in doing so. |
| THE COURT: | Okay. Well, you probably are. It's been awhile. |
| [CHARLES'S COUNSEL]: | I was saying I might wait another 30 days if you're giving something consideration. |
| THE COURT: | I would rather see at least the form of the order — *if I'm going to reconsider something, I would like to see what I'm reconsidering.* |
| [PEGGY'S COUNSEL]: | Yes, sir. |
| [CHARLES'S COUNSEL]: | We'll have it next week, Your Honor. |
| THE COURT: | Okay. |
| [PEGGY'S COUNSEL]: | In the meantime, would it be appropriate if I gave you the divorce itself, the divorce of the parties, or should we wait? |
| THE COURT: | *No. I want to do it all at one time.* The supreme court likes it better that way. |

(Emphasis added).

¶28.    Although Peggy's counsel requested the chancellor to enter an order solely granting

the divorce, the chancellor chose not to do so.[2]  Rather, the chancellor again left the matter

---

[2] Had the chancellor entered such an order of divorce, it would not have been "final" without a Mississippi Rule of Civil Procedure 54(b) certification. *See M.W.F. v. D.D.F.*, 926 So. 2d 897, 899-900 (¶¶4-6) (Miss. 2006) (judgment of divorce not final where custody and division of assets not yet adjudicated).

open pending resolution of all issues. On March 25, 2014, the chancellor wrote the attorneys and requested that Peggy's counsel submit a proposed final judgment consistent with the bench ruling. Both sides submitted proposed judgments. However, the judgments differed in (1) who was granted the divorce and upon what grounds, (2) who was awarded a generator that was wired into the marital home, and (3) the disposition of one of the vehicles. Because of the discrepancies, the chancellor ordered a transcript of the bench ruling. The transcript was received six days after Charles's death, on June 16, 2014. The judgment was then drafted and entered on July 18, 2014.

¶29. Finally, although the judgment states it is consistent with the bench ruling, there are differences. For example, in the final judgment, Charles is awarded the 1992 Jeep Wrangler and Yamaha jet ski. However, in his bench ruling, the chancellor ordered these same vehicles sold and the proceeds divided. Adding to the inconsistency, these same two vehicles were awarded to Peggy pretrial, for her to liquidate and keep the proceeds. Also, there is no indication of an agreement regarding the disputed personal property, as ordered by the chancellor at the bench hearing. Although the chancellor states in his findings of fact and conclusions of law that all disputes were resolved, the divorce judgment does not reflect such a resolution. Rather, the divorce judgment states: "[T]he personal property in the home shall be divided . . . . If the parties cannot agree on a division of said personal property, then each party shall submit a list to the other party."

¶30. Because all issues were not finally adjudicated prior to Charles's death on June 10, 2014, the chancellor's entry of the nunc pro tunc divorce judgment was improper. The

chancellor had no authority to enter the divorce judgment. A chancellor may not circumvent the general rule that "a decree rendered against a defendant after his death is void" by entering a judgment nunc pro tunc. Bridges & Shelson, *Griffith Mississippi Chancery Practice* § 620. Consequently, the divorce judgment is void. *See Pittman*, 375 So. 2d at 416-17. Consistent with the supreme court's ruling in *Pittman*, we "reverse[] and render[] [this cause] without prejudice to the rights of any person affected by [Charles's] death[.]" *See id.* at 417.

### III. Confession of Error

¶31. Alternatively, we find the error raised by Peggy is confessed and reversal of the divorce judgment is warranted on this basis. Where no appellee's brief is filed, this Court may "take the appellee['s] failure to file a brief as a confession of error and reverse." *Miller*, 815 So. 2d at 1119 (¶7).

¶32. Charles died prior to the entry of the divorce judgment and prior to this appeal. Charles's trial counsel was allowed to withdraw upon entry of the divorce judgment. Although Charles had living relatives—one of whom testified at the divorce hearing—no party has moved to be substituted on his behalf.

¶33. On April 25, 2015, Peggy filed a "Motion to Enforce Confession of Error," due to the absence of an appellee's brief. We find the motion is well taken. We take it as confessed that the chancellor's entry of the divorce judgment after Charles's death was error. Charles's heirs had the option to come forth and seek substitution to protect his interest after his death, but none have done so. The chancellor's judgment of divorce is reversed and rendered.

15

¶34. **THE JUDGMENT OF THE HARRISON COUNTY CHANCERY COURT IS REVERSED AND RENDERED WITHOUT PREJUDICE TO THE RIGHTS OF ANY PERSON AFFECTED BY THE APPELLEE'S DEATH. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.**

**LEE, C.J., GRIFFIS, P.J., ISHEE, CARLTON, MAXWELL, FAIR, JAMES AND WILSON, JJ., CONCUR. IRVING, P.J., CONCURS IN PART AND IN THE RESULT.**