**IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI**

**NO. 2014-CA-00732-COA**

THE UNIVERSITY OF MISSISSIPPI MEDICAL CENTER            APPELLANT

v.

LEONTYNE LITTLETON, INDIVIDUALLY,            APPELLEE
AND ON BEHALF OF THE ESTATE OF
CLEOPATRA LITTLETON, DECEASED, AND
HER WRONGFUL DEATH BENEFICIARIES

| | |
|---|---|
| DATE OF JUDGMENT: | 05/23/2014 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | JOHN M. COLEMAN JACOB O. MALATESTA |
| ATTORNEYS FOR APPELLEE: | SUZANNE G. KEYS CRYSTAL W. MARTIN |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| TRIAL COURT DISPOSITION: | JUDGMENT IN FAVOR OF THE PLAINTIFF IN THE AMOUNT OF THE STATUTORY MAXIMUM OF $500,000 |
| DISPOSITION: | REVERSED AND RENDERED - 10/04/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., BARNES AND FAIR, JJ.**

**BARNES, J., FOR THE COURT:**

¶1.     The University of Mississippi Medical Center (UMMC) appeals the judgment of the

Circuit Court of Hinds County, which found UMMC liable under the Mississippi Tort

Claims Act for the death of Cleopatra Littleton (Cleopatra), awarding Plaintiff Leontyne

Littleton (Littleton), Cleopatra's mother, the maximum statutory-damage award of

$500,000.[1] On appeal, UMMC raises issues focused on the adequacy of causation testimony by Littleton's expert, Dr. David Wiggins. UMMC argues that the trial court erred in finding Dr. Wiggins qualified as a hospitalist,[2] that his opinions were speculative, and that his opinions and the trial court's findings on Cleopatra's cause of death were contradicted by the autopsy reports. Finding error with the trial court's reliance on the testimony of Dr. Wiggins regarding the proximate cause of Cleopatra's death, we reverse and render judgment in favor of UMMC.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2. On February 18, 2009, Cleopatra, a twenty-nine-year-old nursing student and single mother of two young children, went to the emergency room (ER) at Mississippi Baptist Medical Center (Baptist). She complained of a severe headache that had started the previous morning, as well as nausea and dizziness. A CT scan of her brain showed no abnormalities. Cleopatra was diagnosed with a migraine headache, given some pain medication, and told to return to the ER if her condition worsened or changed.

¶3. On February 20, 2009, Cleopatra returned to the Baptist ER, complaining of shortness of breath and vomiting, as well as a severe headache that was not relieved by headache medicine. Dr. Janet Neilson, a second-year family-practice resident from UMMC, treated

---

[1] Mississippi Code Annotated section 11-46-15(1)(c) (Rev. 2012) establishes the limitations of liability for governmental entities or employees.

[2] A hospitalist is an inpatient internal-medicine physician.

Cleopatra.[3] Since Cleopatra was a nursing student, she was concerned she may have caught the flu interacting with patients; so Cleopatra was given a flu swab as a professional courtesy. The test was negative. Cleopatra was discharged with antibiotics to treat a possible upper respiratory infection, and pain medication for a migraine headache.

¶4. The next afternoon, Saturday, February 21, 2009, Cleopatra went to the UMMC ER, complaining that her headache was worsening, and her vision was blurred. She also complained for the first time that her neck was stiff. A physical examination revealed pain and loss of movement in her neck. She had a temperature of 102 degrees, but her other vitals were normal. Due to these symptoms (which were different and worse than those she presented at the Baptist ER), physicians performed a lumbar puncture, which confirmed a diagnosis of meningitis. Because of Cleopatra's white blood count and elevated protein in her cerebrospinal fluid, the test results were consistent with bacterial meningitis. Therefore, Cleopatra was given antibiotics and steroids, as well as pain medication, and admitted to the internal-medicine ward in the general hospital at UMMC early Sunday morning, in stable condition.[4]

---

[3] Baptist and UMMC had an agreement that UMMC's family medical residency program admitted patients to Baptist who were seen and treated by UMMC family-practice residents. Residents on call at the hospital saw hospitalized patients as well as those who came to the ER. It is undisputed that Dr. Neilson was an employee of UMMC at the time she treated Cleopatra at Baptist.

[4] Dr. Michael Shoemaker-Moyle, an attending physician who was treating Cleopatra, had ordered a pulse oximeter and disposable sensor at 4 a.m. Sunday morning. This device shows if the patient is receiving insufficient oxygen. However, reports show the oximeter was on "stand-by" at 10:45 a.m. and 11 p.m. Sunday, February 22, and at 3 a.m. Monday, February 23. At trial, registered nurse Brittany Fells testified that when Cleopatra died, the alarm of the oximeter should have gone off but did not.

¶5. Later, on the morning of Sunday, February 22, 2009, the nurses' report showed Cleopatra continued to have extreme headache and neck pain, and could not get comfortable; so she was given IV pain medication. Records show her pain subsided, but at 1 p.m. it returned. She was given more pain medication and fell asleep. At 3 p.m., Cleopatra told nurses she was in such pain that she requested medication to "just knock [her] out." Physicians ordered a morphine IV, and Cleopatra was noted as sleeping at 6:50 p.m. Cleopatra continued to be given antibiotics as well. The parties agree that the antibiotics given were appropriate for bacterial meningitis.[5]

¶6. Also on Sunday, Cleopatra called her sister, who was in the hospital at UMMC for several chronic illnesses. Cleopatra complained that the nursing staff was not responding to her calls; so her sister called the UMMC help line to rectify the alleged problem. At approximately 5 p.m., Cleopatra was seen by attending physician Dr. John D. Wofford Jr.[6]

---

[5] Littleton, however, claimed the UMMC nursing staff untimely and improperly administered the dosages. Littleton claims the antibiotic dose at 9 a.m. was given late; however, UMMC's Dr. Matthew Cassell, one of Cleopatra's treating physicians, testified that this delay would not have mattered after the initial dose, and if Cleopatra had viral meningitis, the timing of the antibiotics would have had no impact at all. Additionally, Littleton points out that one dose infiltrated the muscle causing Cleopatra's condition to worsen due to lack of antibiotics, even though her nursing expert admitted this is a common occurrence with IVs.

[6] Littleton complains that there was no consultation between the general medicine physicians and specialized physicians, such as a neurologist, cardiologist, or infectious-disease specialist when Cleopatra was in the hospital; however, this statement is not supported by the record. Dr. Wofford, a hospitalist on staff at UMMC, testified at trial as both an expert and fact witness. He treated Cleopatra on the hospital floor and is board certified in internal medicine as well as infectious diseases. At trial, he was accepted as an expert in both of these specialties. He completed an infectious-disease fellowship and practiced as an infectious-disease specialist for thirteen years, before changing his specialty to emergency medicine, and then taking a position as a hospitalist. While Dr. Wofford's

4

Cleopatra told him that "when she closed her eyes, she saw people." Her head ached, and her neck was still stiff. Dr. Wofford noted that Cleopatra probably had viral[7] and not bacterial meningitis, but his plan was to continue treating her with antibiotics, "watch[ing] for clinical responses" to them, because it was still a "mixed picture."[8] Cleopatra was also treated by third-year resident Dr. Cassell on the hospital floor.

¶7.    On the morning of Monday, February 23, 2009, Nurse Fells recorded on the nursing progress reports that Cleopatra still complained of neck stiffness and headache, but nothing further. Cleopatra was given morphine through her IV for the pain. At approximately 11 a.m., Cleopatra's brother, Martin Littleton, went to visit her. Cleopatra had asked him to bring her a baked potato and sweet tea from McAllisters for her lunch. Martin testified that Cleopatra did not "look like herself." While visiting for about an hour, Martin witnessed a physician, a nurse, and a nursing assistant treat and give medicine to Cleopatra. She told the medical staff her throat was hurting, her vision was blurred, and one arm was tingling; at 12:35 p.m., Dr. Cassell was notified of these symptoms. Dr. Cassell responded five minutes later that he would report to Cleopatra's bedside. Her antibiotics were increased,

current title may not have indicated he was an infectious-disease specialist, he certainly had substantial experience in this specialty.

[7] Expert witnesses testified that viral meningitis is usually not as serious as bacterial meningitis.

[8] Littleton criticized Dr. Wofford for "order[ing] nothing new" for Cleopatra once he considered that her meningitis was possibly viral, but Dr. Wofford testified at trial there is no treatment for viral meningitis except supportive care, such as pain medication and IV fluids. Additionally, giving Cleopatra antibiotics would not have affected a possible viral infection, but would also have done no harm.

and she was given more morphine through her IV. According to the medical records and Fells, a group of physicians examined Cleopatra between 1:00 and 1:35 p.m., including Drs. Cassell and Shoemaker-Moyle. Dr. Shoemaker-Moyle ordered another CT scan on Cleopatra's brain at approximately 1 p.m., given her new neurological complaints, to determine if she had a possible mass lesion on her brain.[9] Cleopatra's vital signs did not change significantly until 4 p.m., when her temperature rose to 102 degrees, and her blood pressure dropped to 91 over 58.[10] Records show Fells was notified of this change. Fells did not notify a physician of this change because she had just given Cleopatra morphine, which would account for this drop in blood pressure. However, both Drs. Wofford and Cassell stated that, in hindsight, they would have preferred to have been notified of the change.

¶8. Fells's testimony and her "daily data records" indicate that she checked on Cleopatra at 4:45 p.m. Fells testified that at this time, Cleopatra opened her eyes when Fells came into the room and when she put down the clipboard. Cleopatra did not say anything, and neither did Fells, because Cleopatra was resting.

¶9. Martin testified that he returned to the hospital Monday afternoon. Entering the room, he thought Cleopatra was asleep, but wanted a nurse to check on her. He went to the desk, told a secretary, and the secretary found Fells. Fells examined Cleopatra and, finding

---

[9] The CT scan was unable to be completed before Cleopatra expired. Regardless, her autopsy showed no brain lesions.

[10] At 8 a.m., her temperature had been 99.2 degrees, her pulse 66, and her blood pressure 151 over 104. At noon, her temperature had increased to 100 degrees, her pulse to 90, and her blood pressure to 153 over 108. Fells attributed the elevation in pulse and blood pressure to Cleopatra's escalating pain. At 4 p.m., Cleopatra's pulse was 86.

6

her nonresponsive, called a "code blue" at 5:14 p.m. Medical personnel unsuccessfully tried to resuscitate her, but Cleopatra was pronounced dead at 5:39 p.m.

¶10. Dr. Charu Subramony, a professor of pathology and director of autopsy services at UMMC, performed the autopsy on Cleopatra's body the day after she died. The initial report, dated June 22, 2009, diagnosed Cleopatra with "meningoencephalitis, partially treated, probably bacterial etiology." Her cause of death was reported as "cerebral edema secondary to bacterial meningitis"; however, the "causative organism" for her meningitis was "unknown" because her premortem and postmortem cerebrospinal-fluid cultures were negative. Therefore, the report stated that additional tests were ordered on tissue samples taken from Cleopatra's brain, and sent to the Infectious Disease Pathology Branch of the Center for Disease Control (CDC).[11] On June 19, 2009, the CDC gave a verbal report to Dr. Subramony that the brain-tissue samples were negative for the bacteria neisseria (the bacteria that most commonly cause meningitis), but further tests were being performed to rule out certain viral pathogens.[12]

¶11. In October 2009, the CDC sent a pathology report to Dr. Subramony that the brain tissue was negative for the bacteria streptococcus pneumoniae and the West Nile virus. On March 15, 2011, Dr. Subramony received an email from the CDC on the final pathology report for the brain tissue. It stated the premortem and postmortem cultures "failed to show

---

[11] Nonetheless, the death certificate, dated February 23, 2009, inaccurately listed sepsis and bacterial meningitis as the immediate cause of death.

[12] UMMC's infectious-disease expert, Dr. Jo Deal, testified that only the most common viral infections for meningitis are tested, as there are so many viral infections that can cause it, and the CDC does not have accurate tests for all of them.

7

a bacterial or entoviral etiology for the meningo inflammation." The autopsy diagnosis was thus changed to "nonsuppurative[13] meningitis and perivascular inflammation" of the brain, as stated on the CDC's final pathology report. As a result of these findings, the autopsy report was corrected to change the cause of death from meningoencephalitis "probable bacterial etiology" to "probably viral etiology." At trial, Dr. Subramony testified that, more likely than not, viral meningitis caused Cleopatra's death, but the CDC "could not find a specific organism causing her meningitis because no organisms were cultured by our routine methods."

¶12. On February 16, 2010, Cleopatra's mother filed her medical-malpractice complaint individually and on behalf of Cleopatra's wrongful-death beneficiaries against Baptist, five physicians (including Dr. Neilson), and UMMC, alleging that all seven defendants failed to exercise the appropriate standard of care, which resulted in Cleopatra's death.[14] Specifically, she claims that Dr. Neilson's failure to diagnose Cleopatra's meningitis at the Baptist ER, and UMMC's inadequate care and treatment by numerous hospital physicians and nurses during her hospitalization, negligently caused Cleopatra's death.[15]

¶13. Littleton designated Dr. David Wiggins as an expert in each of her three designations

---

[13] "Nonsuppurative" means inflammation without the production of pus.

[14] Prior to trial, Littleton settled with Baptist, and each individual physician-defendant was dismissed, leaving UMMC as the sole defendant at trial.

[15] At trial, Littleton's theory of negligence focused on the UMMC medical staff's alleged breach of the standard of care by not admitting Cleopatra to the intensive-care unit (ICU) once she was diagnosed with meningitis.

of expert testimony.[16] Dr. Wiggins's curriculum vitae shows he is a board-certified ER physician, but notably not an internal-medicine or infectious-disease specialist. Dr. Wiggins opined in his first and second designations that the negligence of the nurses and physicians at UMMC proximately caused Cleopatra's death. In his third designation, Dr. Wiggins disclosed that he would testify that "if [Cleopatra] suffered from viral meningitis, then she needed supportive care," which was provided below the standard of care on the floor of the general hospital. Dr. Wiggins also disclosed for the first time that he would testify that "had [Cleopatra] been in the ICU, the deterioration of her condition, and her heart eventually stopping, could have been promptly dealt with and avoided." Dr. Wiggins concluded in the third designation that but for "the negligence of the physicians (admitting doctor and others Dr. Cassell) in failing to admit [Cleopatra] to the intensive care unit, . . . more likely than not [Cleopatra] would have recovered but did not due to poor supportive care and lack of monitoring by UMC medical staff." UMMC notes, however, that there was no explanation in this third designation of exactly what "supportive care" was lacking, specifically what the standard of care was, or what treatment Cleopatra would have received in the ICU that would have prevented her death.

¶14. On May 14, 2012, a bench trial began. Witnesses testifying for the plaintiff included Littleton herself, Cleopatra's sister and brother, expert witnesses Dr. Wiggins and Patricia Ross, and fact witness Fells. Littleton testified that all of the UMMC staff who treated

---

[16] Littleton filed three expert designations, each naming Dr. Wiggins. The first and second designations, filed in January 2011, contained similar opinions. The third designation was filed in July 2011.

9

Cleopatra were shocked by her sudden death. Cleopatra's brother, Martin, also stated that it was his understanding the UMMC physicians did not know why Cleopatra died – "[h]er heart just stopped." Fells maintained that the last time she checked on Cleopatra at 4:45 p.m. she was alive; then at 5:10 p.m. she was found unresponsive.

¶15. At trial, Dr. Wiggins was tendered, based on his education, experience, and training, as an expert in both emergency medicine and as a hospitalist. UMMC objected to the hospitalist designation because Dr. Wiggins had no regular experience in treating patients on a hospital floor as opposed to the ER. The trial judge ruled Dr. Wiggins would be accepted in both fields, but the judge would decide how much weight would be given to his expert opinion.

¶16. Dr. Wiggins testified that Dr. Neilson was negligent by not performing a lumbar puncture at the Baptist ER, even though Cleopatra only had a severe headache, with no fever or stiff neck. However, he stated that UMMC utilized the proper standard of care in diagnosing Cleopatra when she arrived at the UMMC ER on February 21 by performing a lumbar puncture. While he admitted Cleopatra was properly started on antibiotics, Dr. Wiggins maintained she should have been admitted to the ICU or another unit where she could receive "continuous monitoring." Dr. Wiggins claimed that patients "are *always* admitted to intensive care units when they are diagnosed with meningitis" in the ER. (Emphasis added). Thus, Dr. Wiggins stated the UMMC ER physicians breached the standard of care by not sending Cleopatra immediately to the ICU where she could be closely monitored. Dr. Wiggins also testified that on February 23 at 1:30 p.m., when

10

Cleopatra complained of blurred vision and tingling, the standard of care required the treating physicians to send her to the ICU.

¶17. Dr. Wiggins testified, over an objection, that Cleopatra's cause of death was "lack of adequate monitoring" on the hospital floor, not "direct complications of meningitis." Dr. Wiggins explained that direct complications from meningitis would be "something like a brain stem herniation," where the brain becomes so inflamed that it pushes into the spinal canal and is crushed. Dr. Wiggins further testified that Cleopatra died from "some complication of meningitis which could have been various things . . . . [I]t could have been acidosis, it could have been sepsis, it could have been some cardiac arrhythmia that occurred . . . ." Dr. Wiggins thought Cleopatra died because "what could have been corrected was not even recognized until it was too late." UMMC objected to the speculative nature of Dr. Wiggins's testimony, noting that Dr. Wiggins never articulated what could have been corrected, or how it could have been corrected. Dr. Wiggins concluded that Dr. Neilson, and all of Cleopatra's treating physicians and nurses at UMMC, breached the standard of care, and their negligence was the proximate cause of Cleopatra's death.

¶18. Littleton's nursing expert, Ross, testified that, in her opinion, UMMC's nursing staff breached the standard of care several times regarding Cleopatra's care both in the ER and on the hospital floor. For example, she claims the nursing staff failed to follow the exact physician's orders by checking Cleopatra's vital signs every five to seven hours, instead of four hours, a few times. Also, they failed to have the pulse oximeter on continuously. Finally, Fells did not call a physician at 4 p.m. Monday when she was notified that

11

Cleopatra's temperature had risen and blood pressure had dropped. Ross was surprised at Cleopatra's death and stated it was her experience that most patients with meningitis do not die.

¶19. After Littleton's case-in-chief, UMMC moved for a judgment as a matter of law, because there had been no testimony linking UMMC's conduct to the death of Cleopatra. UMMC argued that Dr. Wiggins's testimony was improper and speculative because he failed to identify what caused Cleopatra's death, and how being admitted to the ICU would have prevented her death. The trial court denied the motion.

¶20. Testifying for UMMC were two of Cleopatra's treating physicians (Dr. Cassell and Dr. Wofford), pathologist Dr. Subramony, and expert witnesses Dr. Michael Studdard and Dr. Deal. Dr. Cassell was accepted as an expert in internal medicine and medicine in general. He explained that he was finishing an oncology fellowship at UMMC, which is considered a subspecialty of internal medicine, in which he is board certified. In 2009, when he treated Cleopatra, he was almost finished with his third year of residency training. He did not believe any physician or the nursing staff breached the standard of care; Cleopatra was treated properly for either viral or bacterial meningitis. He testified that there were no signs or symptoms in Cleopatra's clinical presentation that would have indicated she needed to be placed in ICU. Even with her final set of vital signs at 4 p.m., an hour before she expired, Dr. Cassell would not have placed her in ICU. If Cleopatra had developed sepsis, her blood pressure would have dropped, and her heart rate would have been much higher, but her heart rate was normal. He also thought Cleopatra's blood pressure dropped due to the morphine.

Dr. Cassell testified everyone who knew of Cleopatra's case, let alone treated her, was "dumbfounded" that she died; her death was not foreseeable.

¶21.    Dr. Deal was accepted as an expert in infectious diseases. Dr. Deal, a practicing physician at St. Dominic's Hospital who treats approximately fifty patients a year with meningitis, opined Cleopatra's meningitis was viral, although she could not specify which virus. There was no evidence of bacterial meningitis from the cultures. Dr. Deal testified that Dr. Neilson had no reason to suspect that Cleopatra had meningitis on February 20 because her only symptom was a severe headache. For the same reasons, a lumbar puncture and admittance to the ICU on that day were not appropriate. By the time Cleopatra presented at the UMMC ER, however, she had more symptoms of meningitis, and a lumbar puncture was appropriate. Further, Dr. Deal testified that the antibiotics given in the UMMC ER would not have affected the results of the blood culture taken early on in her hospitalization, but may have impacted the autopsy results "quite a bit." However, if Cleopatra's meningitis were viral, the administration and timing of antibiotics would have had no impact with regard to her death – they would not have helped or hurt her. Dr. Deal stated that patients do not usually die suddenly from either viral or bacterial meningitis, and there were no signs or symptoms indicating Cleopatra was about to die. Finally, she concluded that there was no evidence in Cleopatra's chart that she needed to be in the ICU.

¶22.    Dr. Studdard, UMMC's expert witness in emergency and family medicine, also testified that there was nothing in Cleopatra's medical records that showed that she ever needed to be in the ICU until the point when her heart stopped; she was never in distress and

13

there was no evidence of septic shock. Further, Cleopatra did not initially show any symptoms that would have raised suspicions about meningitis for Dr. Neilson; however, her symptoms were "markedly" changed when she presented to the UMMC ER. Dr. Studdard did not consider Cleopatra's change in vital signs on the day she died significant – the lower blood pressure could have been attributed to receiving morphine. Further, Cleopatra's change in vital signs that day did not indicate she was in distress or shock. Dr. Studdard found it unusual that Cleopatra declined and died so suddenly. Dr. Wofford also testified that there was no indication Cleopatra needed to be admitted to the ICU. He, too, found her death "sudden" and "unexpected."

¶23. Dr. Subramony testified that the cause of death was changed on the corrected autopsy report to "meningoencephalitis, probably a viral etiology" from a bacterial etiology, due to additional information from the CDC testing. The cultures taken failed to grow bacteria; so it was her opinion the inflammation of Cleopatra's meninges was not caused by bacteria. The autopsy indicated the inflammation of Cleopatra's brain was extensive. Dr. Subramony testified that, upon examination, a cavity inside Cleopatra's brain was "obliterated," meaning the walls of the cavity collapsed. The significance of this finding is that "the common cause of this obliteration of the cavity is edema, that is, swelling of the brain." Moreover, Dr. Subramony stated the inflammation in Cleopatra's brain went beyond the meninges, which cover the brain, to the area of the brain that is close to the meninges, or the "subarachnoid space." The autopsy showed this space, which is usually empty, "was occupied by inflammatory infiltrate." She concluded "[t]hat means there's been an inflammation of the

14

meninges with all these cells spilling over into the space . . . [because] there is so much inflammation." The inflammatory cells spread into "the superficial cortex and in some areas [of] the white matter" of the brain.

¶24. The trial court determined in its findings of fact and conclusions of law that UMMC breached its duty of care when Dr. Neilson failed to rule out meningitis and perform a lumbar puncture when Cleopatra visited the Baptist ER on February 20. Additionally, the trial court found Cleopatra's care "abysmal" on UMMC's hospital floor. The trial court concluded Dr. Wiggins's opinion that Cleopatra "suffered complications from meningitis [and that] her death was proximately caused by a lack of monitoring of her condition by UMMC staff" was "supported by the evidence." While UMMC claimed Cleopatra had viral meningitis that only warranted the supportive care of fluids, rest, and monitoring, the court found persuasive Dr. Wiggins's opinion that "regardless of whether her meningitis was bacterial or viral, [Cleopatra] should have been placed in ICU where she could have been more closely monitored, and if she had been in ICU, her death could have been prevented." The trial court stated that "even if one were to believe" that Cleopatra suffered from viral and not bacterial meningitis, and her condition did not warrant being treated in the ICU, UMMC breached its standard of care several times. For example, the nurses did not advise physicians of changes in Cleopatra's conditions, they did not follow physicians orders such as having a pulse oximeter in operation at all times, and physicians were not notified at 4 p.m. Monday when Cleopatra's vital signs changed. The trial court found approximately $1.6 million in total damages, entitling Littleton to $500,000 under section 11-46-15(1)(c).

15

¶25. UMMC timely appealed, raising the following issues: (1) the trial court improperly allowed Dr. Wiggins, an ER physician, to testify about the standard of care for a hospitalist and for ICU care because he was not qualified to do so; (2) Dr. Wiggins was improperly allowed to testify about Cleopatra's cause of death, in contradiction to the autopsy reports, when he had no training, education, or experience in pathology; (3) the trial court should have granted a directed verdict when the evidence on causation and Cleopatra's chance of recovery was speculative; and (4) the trial court's judgment was not based on substantial credible evidence because Littleton failed to provide competent expert testimony on the issue of causation.

## STANDARD OF REVIEW

¶26. A reviewing court affords a circuit judge sitting without a jury the same deference as a chancellor for findings of fact, which is the abuse of discretion standard. *Ill. Cent. R.R. v. McDaniel*, 951 So. 2d 523, 526 (¶7) (Miss. 2006) (citations omitted). "Abuse of discretion is found when the reviewing court has a 'definite and firm conviction' that the court below committed a clear error of judgment [in] the conclusion it reached upon a weighing of the relevant factors." *Id.*

¶27. Additionally, the standard of review for the trial court's admission or exclusion of evidence, including expert testimony, is abuse of discretion. *Tunica Cty. v. Matthews*, 926 So. 2d 209, 212 (¶5) (Miss. 2006) (citation omitted). The reviewing court will not overturn the decision of the trial court on an evidentiary issue unless the trial court abused its discretion, meaning the decision was arbitrary or clearly erroneous. *Barrow v. May*, 107 So.

16

3d 1029, 1034 (¶10) (Miss. Ct. App. 2012) (citation omitted). Regarding the admissibility of expert witness testimony, "the trial judge is to act as a gatekeeper, ensuring that expert testimony is both relevant and reliable." *Poole v. Avara*, 908 So. 2d 716, 723 (¶15) (Miss. 2005) (citation omitted). This standard is not relaxed when the trial judge serves as the finder of fact. *See, e.g. Univ. of Miss. Med. Ctr. v. Lanier*, 97 So. 3d 1197, 1201 (¶15) (Miss. 2012) (finding error in denying UMMC's motion for directed verdict in wrongful-death medical-malpractice case with bench trial because expert's opinion was not based on reasonable degree of medical probability regarding cause of patient's death).

### ANALYSIS

¶28. UMMC argues that the trial court's judgment was not based on substantial credible evidence because Littleton, through her expert Dr. Wiggins, failed to provide sufficient evidence on causation. We agree.

¶29. To establish a prima facie case of medical malpractice, the plaintiff must prove:

> (1) the existence of a duty by the defendant to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) a failure to conform to the required standard; and (3) an injury to the plaintiff proximately caused by the breach of such duty by the defendant.

*Hubbard v. Wansley*, 954 So. 2d 951, 956-57 (¶12) (Miss. 2007) (citing *Drummond v. Buckley*, 627 So. 2d 264, 268 (Miss. 1993)). The plaintiff must provide expert testimony articulating "the requisite standard that was not complied with," and "also establish that the failure was the proximate cause, or proximate contributing cause." *Id.* at 957 (¶12) (quoting *Barner v. Gorman*, 605 So. 2d 805, 809 (Miss. 1992)). For "the proximate-cause element, the plaintiff must introduce evidence which affords a reasonable basis for the conclusion that

17

it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough." *Barrow*, 107 So. 3d at 1034 (¶11) (quoting *Burnham v. Tabb*, 508 So. 2d 1072, 1074 (Miss. 1987)). "In cases alleging that death was caused by the negligence of a health care provider, proximate cause must be established by a medical doctor." *Mariner Health Care Inc. v. Estate of Edwards ex rel. Turner*, 964 So. 2d 1138, 1144 (¶8) (Miss. 2007) (citation omitted). Finally, it is well established that if a plaintiff fails to produce sufficient admissible evidence to establish a prima facie case, a judgment notwithstanding the verdict is appropriate. *Cleveland v. Hamill*, 119 So. 3d 1020, 1024 (¶14) (Miss. 2013) (citing *3M Co. v. Johnson*, 895 So. 2d 151, 167 (¶46) (Miss. 2005)).

¶30. The admission of expert testimony is governed by the two-prong inquiry of Rule 702 of the Mississippi Rules of Evidence. "A witness may testify as an expert to 'assist the trier of fact to understand the evidence or to determine a fact issue' if the witness is 'qualified as an expert by knowledge, skill, experience, training, or education' and 'if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.'" *Hubbard*, 954 So. 2d at 957 (¶13) (quoting M.R.E. 702). The trial court has a "gatekeeping responsibility to ensure that any and all scientific testimony is not only relevant, but reliable." *McDaniel v. Pidikiti*, 39 So. 3d 952, 956 (¶9) (Miss. Ct. App. 2010) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

¶31. In finding UMMC liable for Cleopatra's death, the trial court based the majority of

its ruling on Dr. Wiggins's expert testimony. Although Littleton tendered Nurse Ross as an expert witness on the alleged breach of the standard of care by UMMC employees, Dr. Wiggins was Littleton's only expert witness on causation. Further, because Cleopatra's specific cause of death was unknown, Dr. Wiggins could not establish, except through speculation, what UMMC medical staff could have done to save her life. It was his opinion that Cleopatra's death was caused by the alleged failure to send her to the ICU where she would have been more closely monitored. We find, though, that Dr. Wiggins failed to establish a causal connection between UMMC's alleged negligence and Cleopatra's death because his testimony was impermissibly based on speculation. We shall discuss Dr. Wiggins's cause-of-death testimony and standard-of-care testimony in turn.

**Cause-of-Death Testimony**

¶32.    Because the specific cause of Cleopatra's death was unknown according to the final, corrected autopsy report, Dr. Wiggins's testimony could not specify with any certainty what measures medical personnel could have taken to save her. While expert testimony need not conclusively establish the cause of death, expert causation testimony must, at a minimum, show that deviations from the standard of care caused or contributed to the decedent's death. *Mariner*, 964 So. 2d at 1144 (¶8) (citations omitted).

¶33.    UMMC cites to *Worthy v. McNair*, 37 So. 3d 609 (Miss. 2010), a medical-malpractice and wrongful-death case, as analogous regarding contradictory evidence as to cause of death. In *Worthy*, the physician-expert witness testified about the infant's cause of death in contradiction to the autopsy report performed by an expert pathologist. *Id.* at 613

(¶10). The Mississippi Supreme Court affirmed the trial court's determination that the expert witness's testimony was inadmissible not only because he was testifying outside of his particular discipline, but also because the autopsy report his opinion relied upon reached an inconclusive result. *Id.* at 616-17 (¶24). As in *Worthy*, the autopsy report Dr. Wiggins relied upon reached an inconclusive result regarding Cleopatra's cause of death.

¶34. Testimony and medical records show that Cleopatra more likely than not had viral meningitis, which is usually much less deadly than bacterial meningitis. However, according to the autopsy report, Cleopatra did not die directly from meningitis because her meninges did not rupture. Dr. Wiggins agreed, stating she "did not die from direct complications of meningitis." He also agreed that the exact cause or mechanism of her death was unknown, testifying that Cleopatra died of "some complication of meningitis." He stated:

> [T]he way I would fill out a death certificate on this particular case, would be that the person died of cardiac arrest secondary to some things which were secondary to meningitis, basically. . . . [W]e have a pathology report, which variously attributes to either bacterial or viral meningitis . . . . [I]t's not really that significant whether it's one or the other in this particular case because the care was lacking at a more fundamental level. But we know that the patient's heart stopped beating and . . . there's an important point to make here . . . that the person died because of the lack of the monitoring. She didn't die from direct complications of meningitis. That would be something like a brain stem herniation or something. If the brain became so inflamed that it was actually pushed into the spinal canal and crushed. That could happen but it didn't happen in this case. The person died of some complication of meningitis which could have been various things. That's why when I said how I'd fill out the death certificate I left a middle empty. It could have been acidosis, it could have been sepsis, it could have been some cardiac arrhythmia that occurred as a complication.

However, since he could not identify which possible complication of meningitis caused Cleopatra's heart to stop, his opinion that the ICU would have saved her life is mere

20

speculation and insufficient to establish causation. He needed to establish, to a reasonable degree of medical probability, the causal link between the hospital's failure to properly care for Cleopatra and the cause of the injury. He failed to do so.

**Standard-of-Care Testimony**

¶35.    The trial court relied on Dr. Wiggins's testimony on the standard of care, to the exclusion of all of the other physician-expert testimony presented at trial. Dr. Wiggins was accepted as an expert in emergency medicine, but UMMC objected to his admission as a hospitalist because he had only treated an occasional patient with meningitis on the hospital floor, and the majority of his experience was in treating patients with meningitis in the ER only, before they were sent to the hospital. UMMC notes Dr. Wiggins was also not experienced in intensive care outside of the ER setting, had never treated anyone in Cleopatra's condition in the ICU, and had no residency or subspecialty in critical or intensive care; therefore, he was unqualified for testifying about the standard of care for Cleopatra's hospital stay.

¶36.    Dr. Wiggins testified that UMMC breached the standard of care as follows: Dr. Neilson's not performing a lumbar puncture at the Baptist ER;[17] not admitting Cleopatra to the ICU once she was diagnosed with meningitis; and not sending Cleopatra to the ICU when her condition changed February 23. Dr. Wiggins testified that if Cleopatra had been in the ICU, those physicians and nurses would have noticed Cleopatra's declining condition, because she would have been more carefully monitored, and would have been provided

---

[17] The alleged breach of this standard of care is not addressed in the appellate briefs.

treatment to prevent her death. However, he did not specify the exact nature of her declining condition, or the exact treatment the ICU could have provided to save her life, besides "monitoring." He also did not state what type of specialists would have been called in to treat Cleopatra in the ICU. UMMC expert-witness physicians Dr. Cassell, Dr. Deal, Dr. Studdard, Dr. Subramony, and Dr. Wofford all testified that the hospital and the physicians' standard of care was met.

¶37. UMMC cites *Griffin v. North Mississippi Medical Center*, 66 So. 3d 670 (Miss. Ct. App. 2011), a "loss of chance of recovery" case, as instructive regarding physician/expert-witness testimony to establish causation.[18] In *Griffin*, this Court affirmed a directed verdict in favor of the hospital. *Id.* at 671 (¶1). The decedent had undergone surgery to place a catheter in her jugular vein for dialysis. The surgeon inadvertently punctured the patient's carotid artery, attempted to repair it, placed the catheter in the jugular vein, and transferred her to a recovery room under the care of nurses. *Id.* at 672 (¶2). In the recovery room, the patient's blood pressure and volume dropped, consistent with internal bleeding due to an ineffectively repaired carotid artery. Her condition deteriorated, and she went into cardiac

---

[18] "To establish the element of proximate cause where the allegation is that a medical provider failed to administer proper care and that the failure allowed an already existing injury to deteriorate, the plaintiff must prove that had proper care been administered, then it is probable, or more likely than not, that a substantially better outcome would have resulted." Stated another way, "the plaintiff must show that, absent malpractice, there is a greater than fifty-percent chance that a substantially better result would have followed." *Griffin*, 66 So. 3d at 673 (¶9) (citing *Hubbard*, 954 So. 2d at 964 (¶9)). "Mississippi case law generally requires the plaintiff to employ expert testimony in making this showing." *Drummond*, 627 So. 2d at 270. "This 'greater than fifty percent' opinion must be backed up by specific facts." *King v. Singing River Health Sys.*, 158 So. 3d 318, 324 (¶26) (Miss. Ct. App. 2014) (citing *Hubbard*, 954 So. 2d at 965-66 (¶48)).

arrest before the artery could be repaired; she passed away several days later. *Id.* at (¶3). The plaintiffs claimed that if the nurses had noticed her worsening condition sooner, a surgeon could have intervened sooner and saved her life. *Id.* at (¶6). The plaintiffs offered the expert testimony of a family- and emergency-medicine physician, who was not a surgeon. *Id.* at 673 (¶13). He testified regarding causation that the hospital proximately caused her death by failing to recognize her blood loss. *Id.* at 673-74 (¶13). However, he did not testify as to what a surgeon would have done once notified of the blood loss, or the chance of success if the surgeon had timely intervened. Further, since he was not a surgeon, any testimony on these matters would have drawn an objection. *Id.* at 674 (¶13). The trial court found the physician's testimony insufficient to create a jury question on proximate cause. *Id.* at (¶14).

¶38.    Similarly, Dr. Wiggins testified that UMMC's physicians and staff negligently failed to recognize Cleopatra's worsening condition on February 23, because her temperature had elevated through the day, and at 4 p.m. her blood pressure had dropped. However, he did not identify what care should have been provided and how that care, more likely than not, would have allowed Cleopatra to survive. Dr. Wiggins also failed to explain how UMMC's failure to provide supportive care or transfer Cleopatra to ICU caused or contributed to her death. He merely alleged that the standard of care for meningitis is to place the patient in the ICU; with proper monitoring, the ICU would have been aware Cleopatra suffered cardiac arrest[19] and could have somehow resuscitated her. However, to prove causation, Dr.

---

[19] It is true that if turned on, Cleopatra's pulse oximeter would have sounded an alarm when her heart stopped, but it did not. The alarm may have alerted nurses sooner to

23

Wiggins needed to testify not only as to what procedures would have saved Cleopatra's life from cardiac arrest, but also that there was a fifty-one percent or greater chance she would have had a better outcome had these unknown procedures been performed. Moreover, there is no evidence that the unnamed lifesaving procedures would have been successful, because Cleopatra may well have died anyway from the unknown underlying cause of the cardiac arrest. Treatment in the ICU does not guarantee survival; it was mere speculation that ICU care would have changed Cleopatra's outcome, much less increased her probability of survival beyond fifty percent. We cannot find that Dr. Wiggins's testimony met the lost-chance-of-recovery standard.

## CONCLUSION

¶39.   We find the trial court abused its discretion in relying upon Dr. Wiggins's speculative testimony in order to find UMMC liable for Cleopatra's death. Dr. Wiggins claimed that admitting Cleopatra to the ICU would have saved her life from an unknown cause of death. Yet he offered no specifics on the treatment that she would have received, and how monitoring would have saved her life. Moreover, under the "lost chance of recovery" theory, Dr. Wiggins did not offer sufficient evidence to show that, absent malpractice, there was a greater than fifty-percent chance that a substantially better result would have occurred had Cleopatra been admitted to the ICU. Accordingly, we reverse the judgment and render in favor of UMMC.

---

Cleopatra's cardiac arrest. However, UMMC physicians did order one for her when she was admitted to the hospital. It is unclear from the record why the oximeter was on "stand-by" Sunday and early Monday morning.

24

¶40.    **THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY, FIRST JUDICIAL DISTRICT, IS REVERSED AND RENDERED.  ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, FAIR, WILSON AND GREENLEE, JJ., CONCUR.  CARLTON AND JAMES, JJ., NOT PARTICIPATING.**