# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00265-COA

| | |
|---|---|
| THEOPOLOIS HARPER, INDIVIDUALLY AND ON BEHALF OF ALL THE HEIRS AT LAW AND WRONGFUL DEATH BENEFICIARIES OF LAURA TINE HARPER, DECEASED | APPELLANT |

v.

| | |
|---|---|
| HUDSPETH REGIONAL CENTER AND MISSISSIPPI DEPARTMENT OF MENTAL HEALTH | APPELLEES |

| | |
|---|---|
| DATE OF JUDGMENT: | 01/13/2017 |
| TRIAL JUDGE: | HON. JOHN HUEY EMFINGER |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DAVID L. VALENTINE |
| ATTORNEYS FOR APPELLEES: | STUART ROBINSON JR. |
| | RICHARD T. CONRAD III |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED: 08/21/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., FAIR AND TINDELL, JJ.**

**TINDELL, J., FOR THE COURT:**

¶1.     Laura Harper died while in the care of Hudspeth Regional Center. Following Laura's death, her brother, Theopolois Harper, individually and on behalf of Laura's heirs-at-law and wrongful-death beneficiaries, sued Hudspeth[1] and the Mississippi Department of Mental Health (collectively, the Appellees) under the Mississippi Tort Claims Act.[2]     After

---

[1] Hudspeth is a state-operated facility.

[2] *See* Miss. Code Ann. § 11-46-13 (Rev. 2012).

conducting a bench trial, the Rankin County Circuit Court found in favor of the Appellees. On appeal, Theopolois argues he proved by a preponderance of the evidence that the Appellees breached their standard of care to Laura and that this breach proximately caused Laura's death and resulted in damages.

¶2. Because we find substantial credible evidence supports the circuit court's judgment, we affirm.

**FACTS**

¶3. Laura was born on October 28, 1954, with severe developmental disabilities. On February 12, 1980, Laura became a resident at Hudspeth, which is an intermediate-care facility for the developmentally disabled. For the next twenty-eight years, Hudspeth served as Laura's home. The Hudspeth staff diagnosed Laura with obsessive compulsive disorder (OCD), psychotic disorder, and seizure disorder. To provide better care specifically tailored to Laura's needs, Hudspeth created an individual-support plan (ISP) for her. The staff used the ISP to monitor Laura's progress toward stated goals, and an interdisciplinary team periodically reviewed the ISP.

¶4. On July 21, 2008, the interdisciplinary team reviewed and revised Laura's ISP. The ISP noted that Laura had a good appetite and was allowed to independently feed herself. However, the ISP also stated that Laura ate quickly "and should be monitored closely to prevent her from grabbing food in any environment." In addition, the ISP provided that the staff should redirect Laura "to an area farthest from the door, especially during lunch time"

2

because she might try to steal food from the kitchen. With regard to Laura's other privileges, the ISP stated that she enjoyed going to the different areas of Tulip Cottage (her residence at Hudspeth), "toilet[ed] independently," and had bathroom privileges.

¶5. Laura died on October 26, 2008. Hudspeth's video footage showed Laura's movements prior to her death. The beginning of the video showed Laura asleep in a beanbag chair in Tulip Cottage's north dayroom. A Hudspeth employee awoke Laura, who then exited the dayroom. The employee followed Laura to the door, but after a few seconds, the employee turned around and reentered the dayroom. Laura walked down the north hallway and entered Tulip Cottage's south hallway, where she then entered the south hallway bathroom alone. The video showed Laura's legs while she was in the bathroom.

¶6. After exiting the bathroom, Laura walked back down the south hallway and headed in the direction of Tulip Cottage's kitchen. About forty seconds had passed since Laura had awoken and left the dayroom. After an additional forty seconds passed, Laura reappeared from the direction of the kitchen with what appeared to be cheese in her hand. Laura walked back down the south hallway, entered the north hallway, and stopped outside the dayroom door. Without entering the dayroom, Laura turned around and went back into the south hallway bathroom. A Hudspeth employee followed Laura into the bathroom. After Laura and the employee exited the bathroom, Laura entered Tulip Cottage's south classroom.

¶7. Once inside the classroom, Laura sat down and appeared to eat the item in her hand. A Hudspeth employee came toward Laura for a moment and appeared to speak to Laura.

3

Laura then exited the classroom and walked back into the south hallway bathroom. A Hudspeth employee again followed Laura into the bathroom. Shortly after, a second Hudspeth employee also entered the bathroom. The video then showed Laura's legs on the floor as one of the staff members exited the bathroom. Nurses then entered the bathroom to help Laura, who remained unresponsive to their efforts. From the time Laura awoke from her nap to the time she collapsed in the bathroom, just over five minutes had elapsed.

¶8. At trial, the circuit court heard testimony from Hudspeth's director, Michael Harris. At the time of Laura's death, Harris served as Hudspeth's assistant director. Although Harris was not at Hudspeth on the day Laura died and had no firsthand knowledge of how she died, he testified he was familiar with Hudspeth's policies and procedures. At the time of Laura's death, Hudspeth's policy directed the staff to observe and monitor patients. While Hudspeth later implemented a policy that directed the staff to escort patients from one area of the residence to another, Harris acknowledged the policy was not in effect at the time of Laura's death. Harris further testified he possessed no experience in providing direct care to patients like Laura at a facility such as Hudspeth and was not qualified to offer an opinion on the nursing standard of care for monitoring and observing patients.

¶9. Mary Stubblefield, who worked at Hudspeth as a risk-management investigator, testified about her investigation into Laura's death. Stubblefield stated that someone from Hudspeth informed her that "it was the practice of the staff to accompany [Laura] from one location of the building to the other." After watching the video footage from the day of

Laura's death, Stubblefield testified that the staff members' actions did not fully comply with the practice she had been told they usually employed for monitoring Laura. Stubblefield further acknowledged, though, that she did not review Laura's ISP, had never worked as a direct-care worker, and was not qualified to offer an opinion as to whether the Hudspeth staff appropriately monitored or supervised Laura on the day of her death. Stubblefield also stated she did not know whether a staff member was monitoring the facility's cameras and watching the live footage as Laura walked around Tulip Cottage prior to her death.

¶10. Dr. Russell Bennett testified for Theopolois as an expert in the fields of nursing and long-term care. In forming his opinions, Dr. Bennett testified that he reviewed discovery, depositions, Laura's medical records and ISP, the video footage from the day of Laura's death, Hudspeth's floor plans, and some of the facility's policies and procedures. The Appellees objected to Dr. Bennett providing any expert opinions related to the video footage and Laura's cause of death. After hearing the parties' arguments, the circuit court found that such testimony fell outside Dr. Bennett's expert designation. The circuit court therefore sustained both objections.

¶11. On direct examination, Dr. Bennett opined the Appellees breached the standard of care owed to Laura because they failed to provide a safe environment for her and observe her activities. Specifically, Dr. Bennett testified the Appellees failed to escort Laura from one area of Tulip Cottage to another and failed to properly secure the kitchen to prevent Laura from obtaining food. On cross-examination, Dr. Bennett agreed there could have been staff

5

members not shown in the video footage who were observing Laura's movements. Dr. Bennett also acknowledged that the applicable standard of care for nursing is a constant and is not necessarily based on one particular facility's policies and procedures.

¶12. Although neither party called Christy Smith to testify at trial, the Appellees offered into evidence excerpts of Smith's deposition testimony. Smith was a registered nurse who supervised all the registered nurses on staff at Hudspeth. Prior to her deposition, Smith reviewed her nursing notes from the date of Laura's death. Smith testified she was charting when the staff alerted her that Laura had choked. After performing a finger sweep of Laura's mouth, Smith removed some cheese, checked Laura's pulse, retrieved a crash cart, and began CPR on Laura.

¶13. With regard to Hudspeth's client-monitoring policies and procedures, Smith testified that, if patients were left in a room by themselves, staff members were supposed to check on the patients every fifteen minutes. Smith agreed that Hudspeth's policy directed staff members to not allow patients to enter the kitchen unsupervised. However, Smith denied that Hudspeth breached the standard of care owed to Laura by allowing her to walk around the facility's different areas unsupervised.

¶14. Smith testified that Laura had bathroom privileges and that Laura "could walk around by herself because the cottage [was] her home." Smith also stated that Laura did not have to be followed around the cottage. According to Smith, "monitored closely" meant that the staff had to know where Laura was at all times, but they did not have to be right there with

6

Laura or looking directly at her. Smith testified that Laura was not under constant one-on-one supervision. Smith further stated that, even if staff members saw Laura had obtained some cheese, they did not have to take the cheese from her if they did not think Laura would choke on it. Although Smith testified it appeared Laura had in fact choked on some cheese, she stated the incident also could have occurred during any meal.

¶15. Luanne Trahant testified for the Appellees as an expert in the fields of nursing and patient care and, more specifically, in the care of individuals in intermediate-care facilities for the developmentally disabled. In forming her expert opinions, Trahant reviewed records and documents from Hudspeth, deposition testimony, and the video footage. According to Trahant, a facility such as Hudspeth does not typically provide one-on-one patient supervision and observation except for a specified purpose, such as a patient's time out, or in emergency circumstances. Consistent with Smith's testimony, Trahant stated the staff in such facilities is only required to be aware of a patient's general whereabouts on an every fifteen-minute basis.

¶16. Based on the documents she reviewed, Trahant found that Laura did not require one-on-one supervision and could, within reason, move independently around Tulip Cottage unless her programming schedule required her to be somewhere specific. Trahant stated that the Hudspeth staff followed Laura's ISP and appropriately monitored Laura. Trahant further stated that fifteen-minute checks on Laura was a very reasonable plan for the staff to follow. In Trahant's expert opinion, the Hudspeth staff properly monitored and observed Laura on

7

the date of her death and did not breach the standard of care.

¶17. After considering the evidence and testimony, the circuit court found the staff at Hudspeth may have breached the facility's policy by allowing Laura to obtain cheese from the kitchen. Even so, the circuit court determined "that such action did not violate the standard of care" the Appellees owed to Laura. Because the circuit court concluded that no breach of the standard of care proximately caused Laura's death, it found in favor of the Appellees. Aggrieved, Theopolois appeals.

## STANDARD OF REVIEW

¶18. This Court affords a circuit-court judge sitting without a jury the same deference as a chancellor, and we will not disturb the circuit court's findings when supported by substantial credible evidence. *City of Jackson v. Lewis*, 153 So. 3d 689, 693 (¶4) (Miss. 2014). Furthermore, we will not disturb a circuit court's findings after a bench trial unless the circuit court manifestly erred, was clearly erroneous, or applied an erroneous legal standard. *Id.* However, we review questions of law de novo. *Stratton v. McKey*, 204 So. 3d 1245, 1248 (¶8) (Miss. 2016).

## DISCUSSION

¶19. On appeal, Theopolois contends he presented sufficient evidence to establish a prima facie case of medical negligence. He therefore asks this Court to reverse the circuit court's judgment and to remand the case for a trial on damages.

¶20. To establish a prima facie case of medical negligence, a plaintiff must prove:

(1) the defendant had a duty to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) the defendant failed to conform to that required standard; (3) the defendant's breach of duty was a proximate cause of the plaintiff's injury[;] and[] (4) the plaintiff was injured as a result.

*Glenn v. Peoples*, 185 So. 3d 981, 985 (¶11) (Miss. 2015). "The plaintiff must provide expert testimony articulating the requisite standard that was not complied with, and . . . establish that the failure was the proximate cause, or proximate contributing cause." *Univ. of Miss. Med. Ctr. v. Littleton*, 213 So. 3d 525, 535 (¶29) (Miss. Ct. App. 2016) (internal quotation marks omitted). With regard to proximate causation, "the plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough." *Id.* (quoting *Barrow v. May*, 107 So. 3d 1029, 1034 (¶11) (Miss. Ct. App. 2012)).

¶21. In the present case, Laura's ISP noted her tendency to try to steal food from the kitchen and to eat too quickly. According to the excerpts from Smith's deposition, Hudspeth's policy directed staff members to not allow patients to enter the kitchen unsupervised. After reviewing the video footage from the date of Laura's death, the circuit court concluded that Hudspeth's staff may have indeed violated a facility policy by allowing Laura to obtain cheese from the kitchen. Despite this fact, the circuit court found the staff's conduct failed to amount to a breach of the standard of care owed to Laura. The circuit court further concluded that no expert testimony demonstrated the Appellees proximately caused

9

Laura's death by breaching the standard of care.

¶22. Based on the trial testimony and evidence, the circuit court found Laura "was free to move about the cottage so long as the staff knew where she was at least every [fifteen] minutes" and that she had "bathroom privileges," which meant she could go to the restroom unescorted. In Trahant's expert opinion, Laura was an independent patient who, within reason, could move about Tulip Cottage without an escort unless her programming schedule required her to be somewhere specific. Smith corroborated Trahant's expert opinion by testifying that Laura could walk around Tulip Cottage by herself because the cottage was her home. Although Trahant and Smith testified the staff was required to know Laura's location at all times and to perform fifteen-minute checks on her, they also both stated that "monitored closely" did not equate to constant one-on-one supervision. According to both Trahant and Smith, the Hudspeth staff appropriately monitored Laura on the date of her death and did not breach the standard of care owed to Laura.

¶23. After considering both Trahant's and Dr. Bennett's expert opinions, the circuit court determined Trahant's testimony to be more credible as to the relevant standard of care and whether a breach occurred. Upon review, we find substantial credible evidence supports the circuit court's determination. We therefore conclude this assignment of error lacks merit.

**CONCLUSION**

¶24. Because we find substantial credible evidence supports the circuit court's judgment, we affirm.

10

¶25.   **AFFIRMED.**

   **LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR.**