# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00329-COA

**CLEVELAND MEDICAL CLINIC PLLC**                                    **APPELLANT**

**v.**

**JESSIE EASLEY, ADMINISTRATOR OF THE**                         **APPELLEE**
**ESTATE OF GENE AUTRY EASLEY,**
**DECEASED**

DATE OF JUDGMENT:                  09/25/2017
TRIAL JUDGE:                       HON. ALBERT B. SMITH III
COURT FROM WHICH APPEALED:         BOLIVAR COUNTY CIRCUIT COURT,
                                   SECOND JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANT:           ROBERT J. DAMBRINO III
                                   ASHLEY NOBILE LANE
ATTORNEY FOR APPELLEE:             ELLIS TURNAGE
NATURE OF THE CASE:                CIVIL - MEDICAL MALPRACTICE
DISPOSITION:                       REVERSED AND RENDERED - 12/17/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE BARNES, C.J., GREENLEE AND LAWRENCE, JJ.

### BARNES, C.J., FOR THE COURT:

¶1.     A Bolivar County Circuit Court jury found Cleveland Medical Clinic PLLC (CMC) liable for the wrongful death of Gene Easley (Gene) and awarded his estate (Easley) $744,042.25 in damages. After the circuit court denied CMC's motion for a judgment notwithstanding the verdict (JNOV), CMC appealed raising issues about the admissibility of testimony by Easley's expert witness. Due to Easley's failure to file an appellee's brief and the voluminous and complicated record on appeal, we consider the merits of CMC's claims to determine if an apparent case of error exists. Finding the expert testimony was

insufficient to support the verdict, we reverse and render the judgment.

## FACTUAL SUMMARY

¶2. On December 30, 2007, Gene—a fifty-six year old male—was admitted to Bolivar Medical Center (BMC) by Dr. James Warrington, his physician of ten years who was employed by CMC. Gene's complaints were shortness of breath, malaise, weakness, and black, tarry bowel movements. As noted in CMC's brief, Gene "had a complicated medical history." Among his prior medical issues, he had (1) a stroke; (2) diverticulitis; (3) bilateral below-knee amputation due to gangrene; (4) congestive heart failure; and (5) high blood pressure. Gene also had end-stage renal failure and was a dialysis patient of Dr. Michael Portner, a nephrologist with Renal Care Group.

¶3. Upon admission, Dr. Warrington ordered the typing and cross-matching of blood products and periodically ordered blood transfusions. Dr. Portner was consulted and diagnosed Gene with anemia related to his underlying renal condition. Dr. Bennie Wright, a surgeon, performed an esophagogastroduodenoscopy (EGD) to determine the source of Gene's bleeding. Dr. Wright identified the presence of gastric ulcers but found no active bleeding. All three doctors continued to monitor Gene's progress, with Dr. Warrington responding to any changes and ordering more blood transfusions and lab tests.

¶4. On the morning of January 9, 2008, Dr. Warrington conducted rounds at BMC and noted in Gene's patient chart that he was "doing well" and would be discharged after receiving dialysis that morning. Gene began hemodialysis at 8:20 a.m. under Dr. Portner's care. He was given heparin, a blood-thinner, and his blood pressure was 141/69. However,

2

at 10:15 a.m., Gene had a large bloody stool; so Dr. Portner cancelled Gene's scheduled discharge from the hospital, and he was taken back to his hospital room at 11:20 a.m. In the meantime, Gene had three more bloody stools.

¶5. At 12:09 p.m., Dr Warrington was en route from Cleveland to Clarksdale to see patients when he was informed by BMC of Gene's bloody stools. He gave a telephone order for the BMC nursing staff to type and cross-match blood and to call Dr. Wright, who ordered a transfusion of one unit of blood and for staff to call him if Gene's hematocrit got below 26.[1] The blood transfusion was started at 2:15 p.m. Shortly thereafter, BMC contacted Dr. Warrington to tell him that Gene was complaining of pain; so the doctor ordered a low dose of Demerol at 3:00 p.m. At 3:15 p.m., Gene's blood pressure was 79/49. Thirty minutes later, his blood pressure dropped to 49/29; so BMC called Dr. Warrington to provide a status update. He told BMC to contact his partner, Dr. Kimberly Webb, who was at BMC conducting rounds in his absence.

¶6. When Dr. Webb arrived a few moments later, Gene was going into respiratory arrest (a "code blue"). He was resuscitated and transferred to BMC's intensive care unit (ICU). Dr. Webb issued an order to type and cross-match four units of blood and transfuse at 4:20 p.m, and she examined Gene at 6:00 p.m. However, a short while later, Gene went into respiratory arrest again, and he died at 8:08 p.m. The cause of death was respiratory failure secondary to an alleged gastrointestinal (GI) bleed and end-stage renal disease.

---

[1] According to the record, a hematocrit reading is a measurement of a person's blood count. A normal count is about 40. Gene's hematocrit when he was admitted was 22. On the morning of January 9, it had improved to 29.

## PROCEDURAL HISTORY

¶7.     On March 10, 2010, Jessie Easley, the administrator of Gene's estate, filed a complaint with the circuit court against PHC-Cleveland d/b/a BMC, CMC, Renal Care Group, and Dr. Portner. The complaint alleged a wrongful-death claim caused by healthcare-provider negligence and sought "monetary damages for defendants' joint and combined negligent acts."[2]

¶8.     CMC filed a motion for summary judgment on March 2, 2012, asserting that Easley's expert witness, Dr. Carl Blond, failed to provide expert medical testimony establishing that CMC "was negligent in the examination, care and treatment of [Gene], and that negligen[ce] was the proximate cause or proximate contributing cause of his death." Finding Dr. Blond's affidavit "create[d] a genuine issue of material fact as to the causal connection between the treatment rendered and Easley's death," the circuit court denied the motion on December 19, 2013. On August 21, 2017, CMC filed a motion to exclude Dr. Blond as an expert witness, which the court also denied.

¶9.     A jury trial was held September 11-14, 2017. The circuit court admitted Dr. Blond as an expert in internal medicine, in nephrology, and as a hospitalist. Dr. Blond opined that when Dr. Warrington first became aware of Gene's bloody stools at 12:09 p.m., he or Dr. Webb should have personally assessed the patient, transferred Gene to the ICU, and

---

[2] BMC, Renal Care Group, and Dr. Portner are not parties to this appeal. Easley voluntarily dismissed all claims against Renal Care Group, and the circuit court granted Dr. Portner's motion for summary judgment on December 10, 2015. On July 7, 2017, BMC filed a motion for partial summary judgment, which the circuit court granted. Subsequently, at trial, the court granted BMC's motion for a directed verdict, finding Easley's expert witness failed to establish a standard of care for the BMC employees.

4

consulted an endoscopic doctor to find the active GI bleed. On cross-examination, Dr. Blond conceded that when Gene was admitted on December 30, Dr. Warrington appropriately referred him to the surgeon, Dr. Wright, and that Gene's blood counts on the morning of his death had improved since his admission days earlier.

¶10. After the plaintiff rested, CMC moved for a directed verdict and renewed its motion to exclude Dr. Blond's testimony. The court denied the motions. Dr. Warrington testified that he visited Gene during his morning rounds, and his impression of Gene's condition was "[t]hat everything was good." He was not notified of Gene's deteriorating condition (i.e., his blood pressure of 49/29) until 3:47 p.m., at which time he told BMC staff to contact Dr. Webb, who was at the hospital. When asked by counsel if there was "anything more that [he or the other physicians] could have done to keep [Gene] alive," he replied, "No, sir." On cross-examination, Dr. Warrington explained that he initially told BMC to call Dr. Wright to look at the patient, rather than Dr. Webb, because Dr. Wright "was in the hospital" and was "the most qualified person to take care of [Gene's] problem at that moment."

¶11. Dr. Robert Boyd, CMC's expert witness in the field of surgery and managed care in a hospital setting, opined that Dr. Warrington's actions after being informed of the bloody stool—consulting Dr. Wright and Dr. Webb—were the appropriate standards of care. Dr. Diedre Phillips, an expert witness in family medicine and in the coordination of medical care by a family medicine physician in a hospital, further testified that the standard of care did not require Dr. Warrington to transfer Gene to the ICU when notified of the bloody stools, noting that Gene's blood pressure was stable at that time and that there was no "indication he was

actively bleeding."

¶12.    The jury rendered a verdict against CMC and awarded damages of $744,042.25, and the circuit court entered a final judgment on September 25, 2017.  CMC filed a motion for a JNOV or a new trial, which the court denied on December 8, 2017.  Because CMC did not receive notice of the court's order until February 2018, it filed a motion for relief from the judgment under Mississippi Rule of Civil Procedure 60(b).  The court granted the CMC's motion for the relief, vacated its December 8, 2017 order, and issued a new order on February 12, 2018, denying the motion for a JNOV or a new trial and granting a remittitur to $500,000 in accordance with Mississippi Code Annotated section 11-1-60 (Rev. 2014).[3]

¶13.    CMC appealed the judgment and, on January 31, 2019, filed its appellant's brief.  On April 9, 2019, Easley's attorney, Ellis Turnage, filed a motion requesting additional time to file the appellee's brief, which had been due on March 2, 2019.  Turnage claimed his staff had been instructed to file the motion for additional time on March 2, but unbeknownst to him, they failed to do so.  CMC opposed the motion, seeking relief under Mississippi Rule of Appellate Procedure 31(d), "including (but not limited to) the denial of oral argument to Appellee."  The Mississippi Supreme Court denied the motion for additional time, finding counsel's reasons for failing to file the appellee's brief to be "inadequate."  CMC's request for relief under Rule 31(d) was dismissed as "premature."  Easley has since filed a motion requesting permission to participate in oral argument pursuant to Rule 31(d).  There was no proper request for oral argument by either party.  Under Mississippi Rule of Appellate

---

[3] The judgment has been stayed pending the appeal.

Procedure 34(b), an appellee shall mark "oral argument requested" on his principal brief, and the appellant "shall make this notation on his reply brief or, if no reply brief is filed, by letter within the time allowed for filing of the reply brief." As the supreme court denied Easley's request to file an untimely brief, and no reply brief or letter requesting oral argument was filed by CMC, we did not grant oral argument in this case. Easley's motion is hereby denied as moot.

¶14.    CMC appeals the circuit court's denial of its pre- and post-trial motions—the motion to exclude Dr. Blond's testimony, the motion for summary judgment, and the motion for a JNOV—on the basis that Dr. Blond's testimony was speculative and insufficient to support the verdict. Before considering the merits of the appeal, we must address the appellee's failure to file a brief. As the reviewing court, we have two options. The first option is to "take the appellee's failure to file a brief as a confession of error and reverse." *Griffith v. Wall*, 224 So. 3d 1293, 1295 (¶8) (Miss. Ct. App. 2017) (quoting *McGrew v McGrew*, 184 So. 3d 302, 306 (¶10) (Miss. Ct. App. 2015)). "This should be done when the record is complicated or voluminous, and the appellant has presented an apparent case of error." *Id*. at 1296 (¶8). However, in "situations where there is a sound and unmistakable basis upon which the judgment may be safely affirmed," the second option "is to disregard the appellee's failure to file a brief and affirm the judgment." *Id*. Considering the parties' numerous court filings, medical records, and four days of trial testimony, it is evident to this Court that the record is complicated and voluminous, comprising twelve volumes. Accordingly, we will review CMC's claims to determine if there is "an apparent case of

7

error."

## DISCUSSION

¶15.     In both his original and supplemental affidavits, Dr. Blond stated that Gene "would have survived if he had received blood and fluids on a STAT basis and had been promptly transferred to ICU" after the occurrence of the bloody stools.  Arguing that his testimony was "unreliable and based upon speculation and conjecture," CMC filed a motion to exclude Dr. Blond as an expert witness, along with its motion for summary judgment.  The circuit court denied the motions and accepted Dr. Blond as an expert witness at trial.

¶16.     On direct examination, Dr. Blond testified that CMC employees, Drs. Warrington and Webb, violated the national standard of care by failing "to transfer [Gene] to an ICU setting for careful monitoring" and failing "to directly speak with an endoscopist to explain that this patient has had a major change in status and is passing bloody stools."  He said that when treating an acute, active GI bleed:

> [A] patient, has to be, number one, *put in an ICU to be monitored closely*; number two; *aggressive care, generally*.  When someone has GI bleeding that's significant, your goal is, first, *to resuscitate them with blood and fluids*, and then, if you believe, it's an upper GI hemorrhage, *you proceed with emergent endoscopy* to find out where they're bleeding from, and, hopefully, be able to correct the bleeding or stop the bleeding that's going on, and that's done by someone who does endoscopy.  *So the first step is close monitoring, and the second step is to proceed with an aggressive workup in an attempt to stop the bleeding*.

(Emphasis added).  Yet when asked on cross-examination what would have happened had Gene been transferred to the ICU at 12:09 p.m., Dr. Blond admitted that he was not certain.

> Q.     Now, if [Gene] had been in the ICU, isn't it true that the blood pressures that we've just gone over -- the blood pressure that we read

8

right before we began to see any blood -- would have been the same blood pressure that -- I mean, because it's in the ICU doesn't change what the blood pressure would have been. It would have been the same.

A. I think that's speculation.

Q. Do you? And I think so too. In fact, you can't tell this [c]ourt and this jury what would have happened if he had been transferred to the ICU at 12:09, can you?

A. I can tell you what could happen, but I can't tell you what would happen.

¶17. After the plaintiff rested its case, CMC's attorney renewed the motion to exclude Dr. Blond's expert testimony, or alternatively, to strike his testimony that Gene should have been transferred to the ICU for monitoring after the bloody stools were reported, citing *The University of Mississippi Medical Center v. Littleton*, 213 So. 3d 525 (Miss. Ct. App. 2016). In *Littleton*, Dr. David Wiggins provided medical expert testimony at trial that the cause of death for the deceased was a lack of monitoring and that the attending physicians breached the standard of care by not transferring the patient to the ICU. *Id*. at 531 (¶13). The trial court found the medical center liable and awarded damages to the plaintiff. *Id*. at 534 (¶24). This Court reversed and rendered the judgment, holding:

> Dr. Wiggins testified that if Cleopatra had been in the ICU, those physicians and nurses would have noticed [her] declining condition, because she would have been more carefully monitored, and would have been provided treatment to prevent her death. However, he did not specify the exact nature of her declining condition, or the exact treatment the ICU could have provided to save her life, besides "monitoring." He also did not state what type of specialists would have been called in to treat Cleopatra in the ICU.
>
> . . . .

> Treatment in the ICU does not guarantee survival; it was mere speculation that ICU care would have changed Cleopatra's outcome, much less increased her probability of survival beyond fifty percent.
>
> We find the trial court abused its discretion in relying upon Dr. Wiggins's speculative testimony in order to find UMMC liable for Cleopatra's death. Dr. Wiggins claimed that admitting Cleopatra to the ICU would have saved her life from an unknown cause of death. Yet he offered no specifics on the treatment that she would have received, and how monitoring would have saved her life.

*Id*. at 538-59 (¶¶36-39). The circuit court acknowledged that under *Littleton*, it would not be sufficient for Dr. Blond to simply state that "the standard of care is to refer him to the ICU and that it would have been a different result." However, in denying both CMC's motion to exclude the witness's testimony and motion for a directed verdict, the judge reasoned:

> I think it was one or two questions that Mr. Turnage asked. In a motion for a directed verdict, if I take all of the evidence most favorable to the plaintiff, I've got to look at those one or two questions, which is going to be looked at on appeal. Yes, you [(CMC)] had Dr. Blond eating out of your hand. I mean, he agreed with everything you said. But that is in direct conflict with the one or two questions that were directly on point that Mr. Turnage asked.

Those questions involved Mr. Turnage's asking Dr. Blond to provide the standard of care for a GI bleed. Dr. Blond responded:

> And so you really have to get after your doctor who does the endoscopy to be there on the scene. What you want to do is stabilize the patient, monitor them in the ICU, get the blood pressure up, and get someone down to do the endoscopy as soon as possible.

¶18. "The standard of review for the admission or suppression of evidence, including expert testimony, is an abuse of discretion." *Utz v. Running & Rolling Trucking Inc.*, 32 So. 3d 450, 457 (¶8) (Miss. 2010). In *Mississippi Transportation Commission v. McLemore*, 863 So. 2d 31, 35 (¶5) (Miss. 2003), the Mississippi Supreme Court adopted a test to determine

10

the admissibility of expert witness testimony as stated in *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), and as modified in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Under the modified *Daubert* standard, the trial court must "perform a two-pronged inquiry"—is the testimony relevant, and is it reliable? *McLemore*, 863 So. 2d at 38 (¶16). An expert witness's opinion cannot be mere speculation but must be based "on the methods and procedures of science." *Id.* at 36 (¶11). "[N]othing is absolutely certain in the field of medicine, but the intent of the law is that if a physician cannot form an opinion with sufficient certainty so as to make a medical judgment, neither can a jury use that information to reach a decision." *Univ. of Miss. Med. Ctr. v. Lanier*, 97 So. 3d 1197, 1203 (¶22) (Miss. 2012) (quoting *Catchings v. State*, 684 So. 2d 591, 597 (Miss. 1996)).

¶19.   CMC urges us to find that the circuit court erred in denying its motion for summary judgment. This Court has held that "appeals from the denial of a motion for summary judgment are interlocutory in nature and are rendered moot by a trial on the merits." *Franklin Collection Servs. Inc. v. Collins*, 206 So. 3d 1282, 1284 (¶8) (Miss. Ct. App. 2016). Therefore, because a trial on the merits was held, the court's ruling on CMC's summary-judgment motion "is not reviewable on appeal and . . . is not a basis for reversal." *Id.* at 1285 (¶10).

¶20.   We agree with CMC that Dr. Blond's expert testimony failed to establish that Dr. Warrington's negligence proximately caused Gene's death and that the court erred in denying its motion for a JNOV. In order to demonstrate a prima facie case of medical negligence, the plaintiff must prove:

11

(1) the defendant had a duty to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) the defendant failed to conform to that required standard; (3) the defendant's breach of duty was a proximate cause of the plaintiff's injury; and (4) the plaintiff was injured as a result.

*Harper v. Hudspeth Reg'l Ctr.*, 270 So. 3d 239, 244 (¶20) (Miss. Ct. App. 2018) (quoting *Glenn v. Peoples*, 185 So. 3d 981, 985 (¶11) (Miss. 2015)). To prove medical negligence, the expert testimony must establish that the defendant's failure to conform to the required standard of care "was the proximate cause, or proximate contributing cause, of the alleged injuries." *McDonald v. Mem'l Hosp. at Gulfport*, 8 So. 3d 175, 180 (¶12) (Miss. 2009). If the "plaintiff fails to produce sufficient admissible evidence to establish a prima facie case, a [JNOV] is appropriate." *Littleton*, 213 So. 3d at 536 (¶29) (citing *Cleveland v. Hamil*, 119 So. 3d 1020, 1024 (¶14) (Miss. 2013)).

¶21. As noted by the circuit court, the expert's merely stating that Gene would have survived had he been transferred to the ICU sooner would have been speculative as discussed in *Littleton*. But unlike the expert in *Littleton*, Dr. Blond also opined that a specialist should have been consulted to treat the GI bleed and provided specifics on treatment. The evidence was undisputed that when Dr. Warrington became aware of the bloody stools at 12:09 p.m., he had BMC staff promptly consult with Dr. Wright, the surgeon who had performed Gene's EGD a few days earlier—a fact both dissenting opinions completely disregard. As Dr. Warrington testified, Dr. Wright was "the most qualified person to take care of [Gene's] problem at that moment." Dr. Wright promptly responded and assessed Gene's condition, ordering more blood. Dr. Blond acknowledged as much on cross-examination:

12

Q. Well, there's really nothing we've identified that Dr. Warrington could have done from where he was, other than what he did, and that is to include and associate and involve a surgeon. There's already a nephrologist on board, and they are managing this patient with blood products, and they are making decisions based on the patient's care having been coordinated by Dr. Warrington; is that right?

A. That's correct.

And as already discussed, testimony that the failure to transfer a patient to ICU for monitoring, standing alone, is insufficient to establish negligence.

¶22. Having reviewed the expert testimony in this case, we find that the evidence was not sufficient to establish causation and that the circuit court erred in denying the motion for a JNOV. Accordingly, we reverse and render the judgment.

¶23. **REVERSED AND RENDERED.**

**CARLTON AND J. WILSON, P.JJ., GREENLEE, TINDELL, LAWRENCE AND C. WILSON, JJ., CONCUR. WESTBROOKS, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS AND McCARTY, JJ. McCARTY, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS AND McDONALD, JJ.**

**McDONALD, J., DISSENTING:**

¶24. The majority reverses the jury's verdict after holding that Easley did not sufficiently prove causation. The jury found: "We the jurors by a vote of 12 to 0 find that Mr. Easley's death was proximately caused or contributed to by Dr. Warrington of Cleveland Medical Clinic due to medical negligence to the care of Gene Autrey Easley."

¶25. The majority correctly acknowledges that "nothing is absolutely certain in medicine." *Univ. of Miss. Med. Ctr. v. Lanier*, 97 So. 3d 1197, 1203 (¶22) (Miss. 2012) (quoting

*Catchings v. State*, 684 So. 2d 591, 597 (Miss. 1996)). Our Supreme Court recently reiterated that the plaintiff is not required to prove causation with certainty. *Norman v. Anderson*, 262 So. 3d 520, 524 (¶13) (Miss. 2019). However, the majority held that Dr. Blond's testimony failed to establish that Dr. Warrington's negligence caused Gene's death and, therefore, the court erred in denying CMC's motion for a JNOV. The Supreme Court held the following in *Estate of Gibson v. Magnolia Healthcare Inc.* 91 So. 3d 616, 625 (¶22) (Miss. 2012):

> Generally, expert testimony is needed in a medical malpractice case to prove that a breach of the standard of care caused or contributed to the alleged injury. However, a medical expert does not have to testify with "absolute certainty," but testimony, taken as a whole, must establish "reasonable medical certainty" that the negligence caused the injuries at issue. Additionally, negligence and causation may be established by circumstantial evidence, "but this rule is qualified to the extent that the circumstances shown must be such as to take the case out of the realm of conjecture and place it within the field of legitimate inference." "Verdicts must rest upon reasonable probabilities and not upon mere possibilities." This Court has ruled that "only in rare and exceptional cases" should the court take such a case from the jury.

(Citation omitted).

¶26. In this case, I believe that causation was established by the following direct and circumstantial evidence: Dr. Blond, Appellee's expert, testified extensively about the standard of care needed to treat a gastric bleed. The following exchange occurred during his direct examination:

> Q. Okay. Dr. Blond, in your opinion, based upon a reasonable degree of medical probability, what did the nationwide standard of care for a GI bleed objectively require Dr. Warrington to do in this patient?
>
> A. With acute, active bleeding that's potentially with large amounts of blood, a patient has to be, number one, put in an ICU to be monitored

14

closely; number two, aggressive care, generally. When someone has GI bleeding that's significant, your goal is, first, to resuscitate [him] with blood and fluids, and then, if you believe it's an upper GI hemorrhage, you proceed with emergency endoscopy to find out where they're bleeding from, and, hopefully, be able to correct the bleeding or stop the bleeding that's going on, and that's done by someone who does endoscopy. So the first step is close monitoring, and the second step is to proceed with an aggressive workup in an attempt to stop the bleeding.

. . . .

Q.      All right. Dr. Blond, in your opinion, based upon a reasonable degree of medical probability, did Dr. James Warrington and Dr. Kim Webb deviate from the nationwide standard of care for admitting a patient with a GI bleed?

A.      On the last day, yes, sir.

. . . .

A.      When you have a large, bloody stool, that suggests a very large bleed, and that means that there's been a major change in their status. And so you really have to get after your doctor who does the endoscopy to be there on the scene. What you want to do is stabilize the patient, monitor [him] in ICU, get the blood pressure up, and get someone down to the endoscopy as soon as possible.

Q.      Okay. Dr. Blond, would you explain to the jury your opinion, based on a reasonable degree of medical probability, of what the nationwide standard of care required Dr. Warrington to do to find the GI bleed.

A.      Again, to find the bleed would be by endoscopist. If there's not an endoscopist present, you really can't find the bleed.

¶27.    It is undisputed that Dr. Warrington, Gene's admitting physician, found out at 12:09 p.m. about the bleed that Dr. Blond characterized as a "massive gastrointestinal hemorrhage," and he failed to assess Gene during this time. Dr. Warrington also admitted that Gene had a gastric blood leak that no one found and no one fixed, even though CMC had the

15

equipment to do both. According to Dr. Blond, based upon a reasonable degree of medical probability, Gene's death was caused by "[a] gastrointestinal bleed."

¶28. It is undisputed that the doctors at the CMC did not personally assess Gene between 12:09 p.m., when Dr. Warrington was notified of the bloody stools, and Gene first coded at 3:55 p.m. Dr. Warrington testified:

Q. And at 3:55, the code blue is going off then; right?

A. Yes, sir.

Q. And, certainly, if a physician - - if Dr. Webb had assessed the patient, under the standard of care notes; right?

A. Yes, sir.

Q. And so it would be reasonable to infer, since this is the only progress note that was written, that even though Dr. Kim Webb was in the hospital, she never assessed the patient; right.

. . . .

Q. And that doesn't say that she [Dr. Webb] assessed the patient - - Mr. Easley - - before he coded, does it?

A. Not before he coded. I thought you had asked did she write a note, and I knew there was a note in there for that day.

. . . .

Q. . . . Dr. Webb had assessed him after the first code blue; right?

A. Yes, sir.

Q. And that was at [4:00 p.m.]?

A. Yes.

Q. So from 12:09 to [4:00 p.m.], that would be right at four hours or about

16

nine minutes short of being four hours.

A. Yes, sir.

Q. And you agree, then, that the chart indicates that no one on the medical staff at CMC came to Bolivar Medical Center to personally assess Mr. Easley during that time period; right?

A. There's none that's reflected in that note, sir.

¶29. Based upon the foregoing, the jury had ample evidence to conclude that "Mr. Easley's death was proximately caused or contributed to by Dr. Warrington of Cleveland Medical Clinic." "When the jury has returned a verdict in a civil case, we are not at liberty to direct that judgment be entered contrary to that verdict short of a conclusion on our part that, given the evidence as a whole, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could have found as the jury found." *Busick v. St. John*, 856 So. 2d 304, 307 (¶7) (Miss. 2003). Causation is generally to be determined by the jury. *Id.* With regard to the sufficiency of the evidence, "this court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence." *Spotlite Skating Rink Inc. v. Barnes*, 988 So. 2d 364, 368 (¶10) (Miss. 2008). "A jury's verdict is given great deference by this Court, and conflicts of evidence presented at trial are to be resolved by the jury." *Johnson v. St. Dominics-Jackson Mem'l Hosp.*, 967 So. 2d 20, 23 (¶10) (Miss. 2007) (internal quotation marks omitted). The expert testimony of Dr. Blond regarding causation was sufficient to sustain the jury verdict. It is obvious to doctors and lay persons alike that if a massive GI bleed is not repaired, a patient will die. In my opinion, a reasonable juror could find, as did

this jury, that the failure to assess Gene's GI bleed for over four hours proximately caused or contributed to his death.

¶30. For these reasons, I respectfully dissent.

**WESTBROOKS AND McCARTY, JJ., JOIN THIS OPINION.**

**McCARTY, J., DISSENTING:**

¶31. In addition to disregarding the literally handwritten finding of the jury as to proximate cause, I believe we continue to raise the standard of proof in medical malpractice actions. This is exemplified by the majority's crucial reliance on a recent case from our Court, upon which the reversal and render is built. *Univ. of Miss. Med. Ctr. v. Littleton*, 213 So. 3d 525, 538-39 (¶¶38-39) (Miss. Ct. App. 2016).

¶32. Our Supreme Court has ruled that "[i]n cases alleging that death was caused by the negligence of a health care provider, proximate cause must be established by a medical doctor." *Mariner Health Care Inc. v. Estate of Edwards ex rel. Turner*, 964 So. 2d 1138, 1144 (¶8) (Miss. 2007). Critically, in *Mariner* the Supreme Court ruled that it "does *not* require that expert testimony conclusively establish the cause of death." *Id*. (emphasis added). It is only that "expert testimony must, at a minimum, show that deviations from the standard of nursing care caused *or contributed* to the decedent's death." *Id*. (emphasis added).

¶33. *Mariner* then crafts a clear rule: an expert does not have to testify with certainty about the cause of death, but an expert can establish proximate cause through showing deviations of the standard of care that caused or contributed to the death. The rest is for the jury to

18

determine.

¶34. Yet in *Littleton*, this Court raised the bar beyond this modest and practical standard, and decided there should be more certainty from experts, even when the expert "agreed that the exact cause or mechanism of [the patient's] death was unknown . . . ." *Littleton*, 213So. 3d at 537 (¶34). As a result, we ruled that "since he [the plaintiff's expert] could not identify which possible complication of meningitis caused [the patient's] heart to stop, his opinion that the ICU would have saved her life is mere speculation and insufficient to establish causation." *Id*. This is beyond what the Supreme Court set out in *Mariner*, and therefore *Littleton* raised the bar beyond what has been long required to meet the standard of proof. Under the majority's formulation in this case, experts have to *know* what caused death—despite the fact that the Supreme Court "does *not* require that expert testimony conclusively establish the cause of death." *Mariner*, 964 So. 2d at 1144 (¶8) (emphasis added).

¶35. To create a standard in contravention of Supreme Court precedent is beyond our power in the first place, but we also then create an impossible hurdle for those seeking to establish causation. It is the rare expert indeed who will be able to testify that she *knows conclusively* what happened and what caused someone's death. Human bodies and medical care are not so easily deciphered, and our precedent has allowed for that uncertainty–and for a jury of the defendants' peers to resolve the dispute in accord with our Constitution.

¶36. As the majority points out, we did not have a properly filed request for oral argument. We must take the procedures and deadlines established by our Rules of Appellate Procedure

19

seriously.  We rule today, however, without the benefit of a response brief from the Easley family.  Given that this appeal involves the death of a Mississippian and the jury rendered a verdict in favor of his family, I would have preferred having their input through supplemental briefing or oral argument before we issue this decision.

¶37.    For these reasons, I respectfully dissent.

**WESTBROOKS AND McDONALD, JJ., JOIN THIS OPINION.**